## LE SAGE et al. v. COMMISSIONER OF INTERNAL REVENUE.
### No. 12431.

United States Court of Appeals
Fifth Circuit.
April 15, 1949.

· Emil Corenbleth of Dallas, Tex., for petitioner.

Theron L. Caudle, Asst. Atty. Gen., Geo. A. Stinson, Sp. Asst. to Atty. Gen., Charles Oliphant, Chief Counsel Bureau of Internal Revenue, and J. M. Morawski, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., and Ellis N. Slack, and Melva M. Graney, Sp. Assts. to Atty. Gen., for respondent.

Before HUTCHESON, HOLMES, and LEE, Circuit Judges.

LEE, Circuit Judge.

This case presents the question of the bona fides and realities for tax purposes of a family-partnership arrangement between father and daughter, and also the question of the actual date of sale of a partnership interest in another and unrelated enterprise. The petitioners, Robert S. and Julia LeSage, residents of the State of Texas, are husband and wife, the latter being a party only because all net income during the calendar years 1942 and 1943, the years involved in this litigation, was community income.

Dealing first with the date of sale of Robert S. LeSage's interest in the McKaig Chevrolet Company to his partner, H. L. McKaig, we are in accord with the decision reached by the Tax Court. In 1936, LeSage, hereinafter sometimes referred to as petitioner, entered into part-

nership with McKaig, each having a half interest in the McKaig Chevrolet Company. In December 1942, McKaig went to petitioner's office in Dallas, and, while there, obtained a definite promise from the petitioner that the latter would "sell out" to him. Though there was some indication that January 1, 1943, was to be the sale date, no consideration was agreed upon until November 15, 1943, when McKaig accepted the petitioner's offer to sell at $80,000. In making the sale, the partners worked from the balance sheet of the business as of December 31, 1942, wherein the petitioner's capital account, representing the cost of the business to him as of that date was $57,405. McKaig reported all of the income from the Chevrolet Company for 1943 as his own and paid income tax on it. The petitioner contends that, though the sale price of his interest was not determined until November 15, the sale actually took place on January 1 and the difference between $57,405, cost of the interest, and $80,000, sale price of the interest ($22,595), is all capital gain, rather than partly capital gain and partly a reflection of income between January 1 and November 15, 1943. The Tax Court held that a part of the difference between cost and sale price represented petitioner's distributive share of profits between January 1 and November 15, 1943, and was taxable as ordinary income, and that only the balance remaining after the income figure was deducted was capital gain. Both the evidence and the law lend support to this holding. Prior to November 15, 1943, the evidence shows, at most, an agreement to sell at a price to be fixed. There is nothing in the record to indicate that prior thereto the purchaser had agreed to or would be bound by any price. By his own testimony, McKaig considered the casual remark of the petitioner in December of 1942 that the price would not exceed $100,000 to have been jokingly made. We think it clear that prior to November 15, the plan for the transaction was of a vague and indefinite nature, with neither partner committed to a fixed course of conduct. The rule applicable generally to a sale is that an agreement as to price is essential and that title does not pass to the buyer so long as the price remains undetermined.[1] There is nothing here to exempt or exclude this transaction from the general rule.

■ The other question concerns the bona fides and realities, for tax purposes, of a partnership between LeSage and his married daughter Mrs. Al Rose Line. The Tax Court, convinced that no business purpose was accomplished by Mrs. Line's having come into the business, decided the partnership fell within the prohibitions which have grown from the Tower and Lusthaus cases.[2] With this conclusion we do not agree.

■ In applying the proper law to a family-partnership case, it is imperative that the fact situation be analyzed, for, as the Supreme Court indicated in the Tower case, a family partnership is not ipso facto without reality taxwise. Investment of capital originating from the member joining, substantial contribution to control and management, or performance of vital additional services were cited by Mr. Justice Black in the Tower opinion as indicia of partnership as contemplated by 26 U.S.C.A. §§ 181 and 182.

The petitioner, a sole trader, operating as LeSage Company, started a wholesale liquor business in 1934. In the year of tax controversy, 85% to 90% of his merchandise was furnished by Hiram Walker & Co. and National Distillers Products Corp. While there was no distribution contract and either party could have withdrawn from the arrangement at will, withdrawal by LeSage would have been expensive to the distillers and withdrawal by the distillers would have left the petitioner with the problem of obtaining another source of supply in a limited field or would have forced him to close down a well-integrated business. The distillers knew the petitioner to be in ill health and knew also that he piloted his own aircraft, and, because of

[1] 46 Am.Jur. § 421. See also Lewis v. Pittman, Tex.Civ.App., 191 S.W.2d 691, 694–695.

[2] Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L. Ed. 670, 164 A.L.R. 1135; and Lusthaus v. Commissioner, 327 U.S. 293, 66 S.Ct. 539, 90 L.Ed. 679.

the expense and delay which might result from uncertainties imminent in these circumstances, they urged that he make some provision for continuance of his business, should he die or become disabled. The petitioner proposed a partnership with his daughter, Mrs. Al Rose Line, and the proposal met with the approval of the distillers. Thereupon, an agreement was drawn up, and, after September 1, 1942, the business continued as a father-and-daughter partnership. Pursuant to the partnership agreement, the petitioner invested in the partnership $723,261.04, which sum was his net investment in his business as of August 31, 1942; and Mrs. Line contributed $361,630.52. Thus the partnership investment was two-thirds by the father and one-third by the daughter. It was provided that all net profits and losses should be so apportioned. Mrs. Line's capital contribution took the form of cash, corporate stocks, and her personal note to the partnership for the balance.[3] The $255,000 from the bank was obtained on a personal note signed by Mrs. Line after she had presented to the bank her balance sheet showing assets in excess of $400,000, including a one-third interest in the LeSage Company. This note also had the petitioner's personal guarantee, although an officer of the bank testified that they would have lent the money had the petitioner's guarantee not been forthcoming. The proceeds of this loan were deposited in Mrs. Line's bank account, and on the same day a check was drawn on that account in the amount of $300,000, payable to the partnership. Other than the bank loan and the personal note given the partnership, Mrs. Line's contribution to the partnership arose from capital which, although it originally belonged to her parents, was hers irrevocably by bona fide gift.

In 1940, Mr. and Mrs. LeSage made a bona fide gift to their daughter of $8,000 in shares of stock. In 1941, they made a bona fide gift to her of securities and property totaling $44,066. Also, in 1941, Mrs. Line was advised that she would be given an-

other $44,000 in 1942; and, on August 27, 1942, she received this last gift. The gifts were made by the LeSages to use up their gift tax exemption under the law. The evidence clearly shows that they were not made in contemplation of any partnership within the family and that the parents retained no control over their substance. At the time the last gift was promised, there was no thought of a father-daughter partnership, and, though this gift was actually made only a few days before the partnership was entered into, it may not be said that it stemmed from the plan for the partnership. The 1942 gift was in cash and was deposited in Mrs. Line's personal account at the Mercantile National Bank. The $25,043 in securities which the daughter contributed to the partnership was a part of the 1941 gift. Aside from the cash and securities she put into the business, she gave to the partnership a note for $36,587.52, representing the balance of her one-third contribution to partnership capital. The note was subsequently paid by application of funds Mrs. Line borrowed, without guarantee or endorsement, from her uncle, J. H. LeSage and one Joe Billups. The note to the bank and its renewals were paid by checks from Mrs. Line's personal account. Her profits from the LeSage Company were deposited to that account and were used to make these payments.

In addition to her contributions to capital, Mrs. Line also rendered administrative services in the partnership and took an active part in determination of business policy. True, she was away from the business headquarters in Dallas the larger part of the time between November 1, 1942 and January 1944, in order to be with her Marine husband at his various stations, but physical absence a great part of the time does not of itself preclude a conclusion that she rendered services and made substantial contributions to control and management. An illustration of Mrs. Line's control and management function in the partnership is the manner in which she blocked the purchase of Century Distilling Company cap-

---

[3] Mrs. Line's contribution to the partnership, LeSage Company, may be itemized as:

| | |
|---|---|
| Bank loan—cash | $255,000.00 |
| Cash from personal account | 45,000.00 |
| Corporate stocks | 25,043.00 |
| Personal note | 36,587.52 |
| Total | $361,630.52 |

ital stock: In 1943, LeSage had an opportunity to buy, with other wholesalers and with National Distilleries, the stock of the Century Distilling Company. The portion for LeSage Company was 15% and the investment required to make this purchase, about $4,000,000. When Mrs. Line was approached on this matter by her father, she objected to the purchase because she had just got into the business and did not wish to risk the loss of her money. Though the petitioner offered to compromise and take only 8% of the Century stock, Mrs. Line continued to object, and the matter caused ill-feeling between father and daughter to the extent that they ceased to speak. Still desiring to embark on the joint venture for the purchase of the Century stock and being blocked by his daughter-partner, the petitioner suggested formation of a corporation to buy part of the Century stock. To this Mrs. Line agreed, for her loss risk would be limited. The corporation was formed, and a good part of its capital was borrowed, the balance being put up by the father and daughter.[4] The Century stock was purchased and Century went into dissolution. Lesco, the corporation petitioner and his daughter had formed for the stock purchase, came into possession of warehouse receipts for 22,000 barrels of whiskey. This whiskey was bottled, and LeSage Company took over its distribution. Before LeSage Company entered upon the undertaking, however, at Mrs. Line's suggestion, the partnership felt out the retail market and obtained from the retailers a $10 deposit on each case of whiskey to be sold. As the result of this suggestion by Mrs. Line and before LeSage Company took possession of the whiskey from Lesco Corporation, $1,800,000 was obtained in deposits: the success of the venture was assured. In addition to this transaction, Mrs. Line during 1942 and 1943 conferred with distillery representatives and with branch managers, people whom she knew and had dealt with. She objected to some shifts in personnel and urged others. Also, she gave her consent to the purchase of stock of another wholesaler, the Ajax Liquor Company, by LeSage Company.

It cannot be said that Mrs. Line rendered no substantial services.

The capital which the daughter contributed was obtained to a considerable extent from sources other than her parents. The bank furnished the loan primarily on the strength of the business venture rather than on the guarantee of petitioner, which was obtained only as an additional precaution. The funds with which Mrs. Line paid her note to the bank came from her partnership profits; the funds with which she paid the note to the partnership were borrowed from her uncle and another individual; the remaining portion of her capital contribution, although traceable to her parents, arose from completed and bona fide gifts, made to her with no conditions attached and with no thought at the time they were made or promised that a partnership between father and daughter would be entered into. In short, the capital may be said to have originated with Mrs. Line, for it did not come from her parents in the manner contemplated by the Supreme Court in the Tower case.

As this Court stated in Belcher v. Commissioner of Internal Revenue, 5 Cir., 162 F.2d 974, a family partnership is not ipso facto illegal and may be upheld, for tax purposes, where there are substantial factors demonstrating the actuality, reality, and bona fides of the association. Cf. Lawton v. Commissioner of Internal Revenue, 6 Cir., 164 F.2d 380, and Canfield v. Commissioner of Internal Revenue, 6 Cir., 168 F.2d 907. The present case is one wherein the Tax Court erred in concluding from its facts that the arrangement was so lacking in good faith and reality that Mr. and Mrs. LeSage are taxable for all profits from the partnership for the year involved.

The deficiencies in income and victory tax, as determined by the Tax Court against Robert S. and Julia LeSage are set aside, and the causes are remanded to the Tax Court for recomputation of deficiencies in line with this opinion.

Affirmed in part and reversed and remanded in part.

---

[4] The contribution by father and daughter to the corporation was $500,000; the balance of the $2,000,000 capital was obtained by bank loan secured by Century stock.