AYRTON METAL COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65071. Filed June 15, 1960.

*Joseph W. Burns, Esq.*, and *Simon Gluckman, Esq.*, for the petitioner.

*Charles M. Greenspan, Esq.*, for the respondent.

470

## OPINION.

TURNER, *Judge:* Two cash payments were received by the petitioner from Metal Traders, $26,000 in February of 1950 and $40,000 in December of 1951. The respondent determined these payments to be ordinary income. Briefly stated, the petitioner contends that its joint account arrangement with Metal Traders was a joint venture, that the payments were consideration for the purchase of its interest in the joint venture by Metal Traders, and that the gain should thus be treated as capital gain rather than as ordinary income.

After carefully examining the terms of the joint account agreement and the conduct of the parties in carrying out its provisions, we think it is clear that the arrangement between the petitioner and Metal Traders was a joint venture. Support for this conclusion may be found in the provisions for the sharing of profits and losses and for the sale of ore only on terms satisfactory to both the petitioner and Metal Traders. Although there is no all-conclusive definition of a joint venture, it is generally a combination of two or more persons seeking a joint profit in some specific venture without designating themselves a partnership or a corporation. A joint venture is usually for the purpose of engaging in a single project which could require several years for its completion, but in most other respects it resembles a partnership and embodies the idea of the mutual agency of its members. *Dexter & Carpenter* v. *Houston,* 20 F. 2d 647; *Beck Chemical Equipment Corporation,* 27 T. C. 840, and cases cited therein.

The joint account was based on an oral agreement, but the terms of a joint venture may be informal and need not be reduced to writing. One member of the joint venture may also reserve the function of managing the common enterprise and financing its affairs, as did Metal Traders, without destroying the existence of the otherwise valid joint venture. Furthermore, the fact that the operations of the joint account were conducted wholly in the name of Metal Traders and that the mine owner was unaware of the petitioner's participation in the enterprise does not defeat the legal relationship. *Beck Chemical Equipment Corporation, supra,* and cases cited therein. Nor do we think it controlling that no articles of partnership or tax returns were filed for the joint account.

As to the $26,000 received in February of 1950, the facts show that as between the parties it was regarded as being representative of petitioner's share of the profits of the joint venture under the

second contract, and we hold that it was ordinary income. For tax purposes, a joint venture is one of the various unincorporated enterprises included within the definition of a partnership under section 3797(a)(2) of the Internal Revenue Code of 1939.[3] Like a partner, a member of a joint venture is required under section 182(c) of the 1939 Code[4] to include in his net income, "whether or not distribution is made to him, * * * his distributive share of the ordinary net income of the partnership." Income received or accrued to a joint venture is taxable to its members whether or not distributed. *Beck Chemical Equipment Corporation*, *supra*. Therefore, the petitioner's distributive share of the income earned by the joint venture under the second contract is taxable to it as ordinary income. And this is true even though the actual receipt of the profits may be in connection with the closing of the joint venture. *Tunnell* v. *United States*, 259 F. 2d 916; *Leff* v. *Commissioner*, 235 F. 2d 439; *United States* v. *Snow*, 223 F. 2d 103, certiorari denied 350 U.S. 831; *LeSage* v. *Commissioner*, 173 F. 2d 826; *Estate of William Goldstein*, 29 T. C. 931; *George F. Johnson*, 21 T. C. 733; and *Louis Karsch*, 8 T. C. 1327. See also *Hulbert* v. *Commissioner*, 227 F. 2d 399, affirming a Memorandum Opinion of this Court; and *B. Howard Spicker*, 26 T. C. 91, 99. A contrary result was reached in *Meyer* v. *United States*, 213 F. 2d 278, and *Swiren* v. *Commissioner*, 183 F. 2d 656.

It is the contention of the petitioner that not all of the Churquini ore purchased under the second contract had been sold when the joint account was terminated, so that the joint account realized no earnings under the second contract because it used the completed contracts method of accounting. The argument is that future losses might wipe out prospective profits. Particular reference is made to a sharp decline in the antimony market during the latter part of 1949. There are two answers to the petitioner's contention. One is that assuming the Japanese sale was made up entirely of Churquini ore, there was no inventory on January 24, 1950, because the remaining 419.623 tons is exactly the amount of ore shipped from Metal

---

[3] SEC. 3797. DEFINITIONS.

(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

  *        *        *        *        *        *        *

(2) PARTNERSHIP AND PARTNER.—The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term "partner" includes a member in such a syndicate, group, pool, joint venture, or organization. * * *

[4] SEC. 182. TAX OF PARTNERS.

In computing the net income of each partner, he shall include, whether or not distribution is made to him—

  *        *        *        *        *        *        *

(c) His distributive share of the ordinary net income or the ordinary net loss of the partnership, computed as provided in section 183(b).

Traders' own stocks. By taking over the 419.623 tons, Metal Traders was only recovering the amount of ore it had shipped to Japan on behalf of the joint account. Another answer is that the joint account could not elect to use the completed contracts method of accounting under the existing regulations. Section 29.42–4 of Regulations 111 [5] limits the use of that method of accounting to businesses with "building, installation, or construction contracts." A contract to purchase ore obviously does not fall within the scope of that section of the regulations.

As a result of the negotiations in London between Samuel Ayrton and Metal Traders, Ltd., petitioner agreed to accept $26,000 in settlement of its claim under the joint account. And though perhaps not precisely one-half of the profits under the second contract, this figure closely approximates petitioner's share of such profits, and was reflected as such in the course of arm's-length negotiations between the parties. But whatever the exact amount which would have been disclosd by mathematical computations, the evidence of record does not convince or persuade us that petitioner's share of the profits was any lesser amount, and under the cases above the great weight of authority is that such profits are taxable as ordinary income, even though actual receipt may have been in connection with the closing of the joint venture.

With respect to the $40,000, the payment thereof by Metal Traders to petitioner was made under the second of two agreements entered into by the parties under date of January 24, 1950. By the first of the two agreements, the joint account was terminated, with the petitioner receiving $26,000, an amount calculated by the negotiators as approximating petitioner's share of profits under the second contract, and with Metal Traders taking over the third contract as its own, petitioner being relieved of any and all liability for loss and no longer being entitled to share in the profits, if any. By the second contract, Metal Traders agreed that it would pay petitioner a "commission" of at least 2 per cent of the purchase price of

---

[5] Sec. 29.42–4. Long-Term Contracts.—Income from long-term contracts is taxable for the period in which the income is determined, such determination depending upon the nature and terms of the particular contract. As used in this section the term "long-term contracts" means building, installation, or construction contracts covering a period in excess of one year from the date of execution of the contract to the date on which the contract is finally completed and accepted. Persons whose income is derived in whole or in part from such contracts may, as to such income, prepare their returns upon either of the following bases:

\* \* \* \* \* \* \*

(b) Gross income may be reported for the taxable year in which the contract is finally completed and accepted if the taxpayer elects as a consistent practice so to treat such income, provided such method clearly reflects the net income. If this method is adopted there should be deducted from gross income all expenditures during the life of the contract which are properly allocated thereto, taking into consideration any material and supplies charged to the work under the contract but remaining on hand at the time of completion.

Churquini ore bought by Metal Traders "subsequent to the Third Contract," so long as the mine continued "in its present ownership." Metal Traders became the owner of the mine on November 28, 1950, and in settlement of a dispute which arose between the parties over the amount owed to petitioner under the "commission" agreement, Metal Traders on December 19, 1951, paid the $40,000 to petitioner.

It is the contention of the petitioner that the "commission" arrangement which was to become effective upon the end of the third contract was acquired by it in exchange for its interest in the joint venture and that the $40,000 received thereunder was capital gain.

Although the meaning of the word "commission" as used in the second of the agreements signed on January 24, 1950, was not spelled out, it is definite by specific wording of the agreement that it was to relate to Churquini ore purchases by Metal Traders "subsequent to the Third Contract," and was to cover or represent the extent and nature of petitioner's participation in such subsequent dealing in Churquini ore. Also, it is equally apparent, we think, that the operations in respect of which the "commission" was to be paid were not only new and prospective in character, but, except that the one followed the other, the parties were the same and both had to do with the dealing in Churquini ore, the "commission" arrangement and the joint venture were not otherwise related. That such was the intent and purpose of the parties under the two agreements signed on January 24, 1950, is corroborated by Kurt Friedlander, vice president of Metal Traders, in his testimony, as follows:

Q. As a result of these discussions, was not an agreement made by which Metal Traders would pay $26,000 plus two percent, at least two percent on purchases?

A. They were two completely distinct things. Firstly, there was $26,000, which was paid in lieu of the profit out of the second and third contracts; secondly, we committed ourselves to pay a minimum two percent commission; more if the business would stand it, and that was in lieu of their continuing the joint account.

At January of 1950, there had been a sharp decline in the antimony market and the profit or loss prospects under the third contract were not definite or clear. The petitioner relinquished its right to any profit and was relieved of its liability for any loss under that contract, in consideration for the taking over by Metal Traders of the 360 tons of ore to be purchased through April 30, 1950.

When the joint account was established in 1947, the petitioner and Metal Traders understood that it was to exist so long as they had a contract with the owner for the purchase of Churquini ore. Neither they nor the owner was committed to make any new or further contract, and as between petitioner and Metal Traders, they were free to work out any further or prospective arrangement they might be

able to agree upon, whether it be a continuation comparable to the existing operation or something new and different, or if they were so inclined they could let the matter die. In short, even if there had been no dispute, there would have been no continuation of the joint account or any other arrangement, in the absence of some affirmative action on their part. The fact is that there never was any joint venture between petitioner and Metal Traders for any period after April 30, 1950, the terminal date of the third contract, and since the parties without question were dealing at arm's length, they must have concluded that the new and different arrangement with respect to prospective dealing in Churquini ore, if any, would be a more satisfactory arrangement than would result from a joint venture for exploiting a new contract with the owner.

And while it is true that the settlement agreement of December 19, 1951, did contain some language to the effect that the payment by Metal Traders of the $26,000 in January of 1950 and the agreement to pay a "commission" of at least 2 per cent in respect of Churquini ore purchases "subsequent to the Third Contract" had been in consideration of the assignment by petitioner of its interest in the "joint venture marketing arrangement," and with respect to the negotiating of the amount of the "commission" due petitioner it did refer to computations based on ore purchases from January 24, 1950, to November 28, 1950, part of which period was covered by the third contract, and further contained provisions to the effect that the $40,000 should "be in full and final settlement of any and all claims of Ayrton with respect to any and all rights which originated out of the joint venture marketing arrangement and the assignment thereof," it is patent, we think, that the rights of the parties under the joint venture, which was coexistent with the three contracts, had already been settled by the first of the January 24, 1950, agreements, and that the matter settled by the December 19, 1951, agreement was the "commission" agreement, also of January 24, 1950, covering Churquini ore purchases "subsequent to the Third Contract." As between petitioner and Metal Traders, no elements of a sale or exchange of capital assets were involved, but rather, the payments were based on and measured by the purchase and sale of ore in the conduct of an ore-selling business. And that would be true, we think, even if in fact there had been a reopening and a new settlement as to petitioner's share of the earnings of the joint venture under the three contracts, the last of which had expired April 30, 1950. It follows, we think, and we hold, that the earnings under the "commission" arrangement were ordinary income.

With respect both to the $26,000 and the $40,000, respondent's determination is sustained.

*Decision will be entered under Rule 50.*