**John K. TEAFORD et al., Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 11884.**

United States Court of Appeals
Seventh Circuit.

June 7, 1957.

Robert E. Teaford, Columbus, Ohio, for petitioner.

Charles K. Rice, Asst. Atty. Gen., Davis Morton, Jr., Lee A. Jackson, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before DUFFY, Chief Judge, and MAJOR and FINNEGAN, Circuit Judges.

FINNEGAN, Circuit Judge.

This appeal presents the question, cutting across five cases heard and consolidated by the tax court, of when a sale transaction is considered consummated for tax purposes. Holding the sale of the partnership interests involved not to have been closed in 1943, the tax court found adversely to appellants on their several petitions tendering issues based on deficiencies and overpayments in income and victory tax for the calendar years 1942, 1943, 1944 and 1945.

Some stipulated facts, parol and documentary evidence introduced during the tax court proceedings, comprise the record and our version of the salient facts is drawn from those sources and the tax court's memorandum decision, John K. Teaford, et al. v. Commissioner, 14 T.C.M. 1052, CCH Dec. 21, 251(M) T.C. Memo. 1955-265. All of the agreements mentioned by the tax court and ourselves are part of the record in this appeal.

John K. Teaford, Seleen Teaford, Trustees of the Joan Kay Teaford Irrevocable Trust, and Seleen Teaford, Trustee of the Shirley Lee Teaford Irrevocable Trust,

entered into a partnership agreement on January 2, 1943 with Danches Brothers Company, a partnership, Abe Danches, Robert E. Teaford, Sara K. Tibbets, Wealthy Westfall, Christa M. Stentzel and Cyril E. Teaford; among other things this agreement provided that John K. Teaford would contribute $84,200.88 and would receive or bear 15% of the profits or losses of the partnership; and that Seleen Teaford, Trustee of the Joan Kay Teaford Trust would contribute $28,066.96 and would receive or bear 5% of the profits or losses of the partnership; and that Seleen Teaford, Trustee of the Shirley Lee Teaford Trust would contribute $28,066.96 and would receive or bear 5% of the profits or losses of the partnership.

That partnership continued on under the partnership agreement and on August 1, 1943, John K. Teaford conveyed by deed of gift two-thirds of his interest in the partnership in the following manner:

To Joan K. Teaford Irrevocable Trust No. 2, 3⅓% interest in the Teaford, Danches and Company partnership;

To Shirley Lee Teaford Irrevocable Trust No. 2, 3⅓% interest in the Teaford, Danches and Company partnership;

To Seleen Teaford Trust, 3⅓% interest in the Teaford, Danches and Company partnership.

This left John K. Teaford with a 5% interest in the Teaford, Danches and Company partnership, and the partnership continued on under the same operation as it had in the agreement dated January 2, 1943.

On November 6, 1943, all of the partners in the Teaford, Danches and Company entered into a memorandum agreement for the "sale" of the interest owned by John K. Teaford, Robert E. Teaford, C. E. Teaford, Sara Tibbets, Wealthy Westfall, Christa Stentzel, Shirley Lee Teaford Irrevocable Trust, Shirley Lee Teaford Irrevocable Trust No. 2, Joan K. Teaford Irrevocable Trust, Joan K. Teaford Irrevocable Trust No. 2, and Seleen Teaford Trust to Abe Danches, Ralph Danches, George Danches, Ethel Danches Weston, and Danches Brothers Company.

When the document dated November 6, 1943, was signed, Teaford, Danches and Company, owed $4,985,051.85 to the First National Bank in St. Louis. Under direct examination John K. Teaford related that Bank's attitude and the subsequent critical events.

"I think possibly even the following day, but within a matter of a very few days following this sale, Mr. Danches and myself went to the First National Bank in St. Louis, where we were very heavy borrowers, and where I kept a constant contact daily, and sat with officers of that institution and explained our action. And in fact, presented a copy, or the original of the agreement in which we had entered to effect this sale and purchase. The officers of the bank were quite alarmed at this situation because, first of all, they had depended upon me almost entirely to manage things in this company to their satisfaction, and I feel correct in saying that they had depended upon me more than anyone else for the repayment of the loans.

"So their first step was to examine the memorandum of agreement to which we had entered, and their Legal Department called us back down to the bank very soon thereafter and explained to us that they *just would not permit us to take the steps that seemed to be anticipated in this agreement* because it, in their opinion, put us in violation of a very large loan agreement under which we were operating with the bank, or the opinion that we were also in violation of our contracts for supplying the product to the Commodity Credit Corporation, which was our one customer. (Italics added.)

"I remember further that the bank was very adamant in their stand on this and even to the point of declaring that they would not even discuss

it with us, that we were going to have to comply with their wishes *or they would immediately foreclose their loans*. And the situation was stated in just those words. So it was proposed by their counsel, their legal counsel, that he, his office draw an agreement which would convey the substance of what we had included in ours, plus the protective features which they insisted upon, and that was done and presented to us for signing and we did execute it. (Italics supplied.)

"Q. Now, after November 6, was there any disruption of the business operations of Teaford, Danches and Company? A. No, there was no disruption of any nature whatsoever.

"Q. And after November 6, did you give up your connection with the company? A. I remained with the company under an agreement for a limited period of time, in compliance with that agreement, but actually I had very little to do with the management.

"Q. Were you paid for your services to the partnership up and above any income you received from your partnership interest? A. Yes, indeed I was. I was paid a flat salary.

"Q. How much was that salary? A. Twelve thousand dollars per year.

"Q. So that you were paid twelve thousand dollars a year for the services that you rendered to the company? A. Yes, I was.

"Q. Now, did the company liquidate after this sale? A. No, sir, there was no liquidation of any nature whatsoever. They continued to operate in identically the same manner that they had always operated, and, in fact, for approximately six months after this sale operated not only in the same manner, but under the same name, under the same printed checks and letterheads and few friends of mine even knew that

we were not connected with that business after the sale."

The upshot of the banker's views produced an agreement dated November 18, 1943 embodying these significant and inescapable provisions:

"Section 1.

"The partnership of Teaford, Danches & Co., as now constituted *shall continue until the First National Bank in St. Louis, Missouri shall in its uncontrolled discretion consent to the dissolution of the partnership, or until all of the indebtedness of said partnership to said First National Bank in St. Louis, shall have been paid,* said consent not being required after said indebtedness is paid in full. (Emphasis added.)

"Section 2.

"The Parties of the First part [the Teaford faction] hereby agree to sell, upon dissolution of said partnership and the Parties of the Second Part [the Danches faction] hereby agree to purchase upon dissolution of said partnership, * * *.

"Section 3.

"Parties of the Second Part hereby agree to pay to Parties of the First Part at the time and times hereinafter mentioned, in full payment for all of the interest of the Parties of the First Part in and to said firm of Teaford, Danches & Co., upon the dissolution thereof, the sum of Three Hundred and Eighty-Seven Thousand, Five hundred dollars ($387,500.00) Dollars, estimated to be fifty (50%) per cent of the net profits of said partnership for the year 1943, and in addition thereto the capital investment of the Parties of the First Part in said partnership of Teaford, Danches & Co. as of the first day of January, 1943, * *.

"Section 4.

"It is expressly understood and agreed, however, that said Parties of **the First Part shall have no other**

and further interest in 'the partnership profits now or hereafter accruing of Teaford, Danches & Co., except to receive the sum of Three Hundred and Eighty-Seven Thousand Five Hundred Dollars ($387,-500.00), and that any and all profits in excess of said sum shall be paid to the Parties of the Second Part, and if said profits do not amount to said sum, then such deficit shall be borne by Parties of the Second Part.

\* \* \* \* \*

"Section 7.

"Parties of the First and Second Parts agree that on or before December 15, 1943, there shall be paid out of the partnership assets of Teaford, Danches & Co. to Parties of the First Part an amount sufficient to enable Parties of the First Part to pay their income taxes due on said date, which sums when paid, shall be credited against the consideration the Parties of the First Part are to receive for their interest in said firm of Teaford, Danches & Co., upon the dissolution of said firm. Parties of the Second Part agree that on or before March 15, 1944, they will likewise pay to Parties of the First Part, either out of the assets of the firm of Teaford, Danches & Co., if said firm shall then be in existence, or out of other assets of the Parties of the Second Part, a sum sufficient to enable the Parties of the First Part to pay their income taxes due on March 15, 1944, which sum shall be credited against the consideration the Parties of the Second Part agree to pay to the Parties of the First Part for the interest of the Parties of the First Part in the firm of Teaford, Danches & Co., upon the dissolution of said firm of Teaford, Danches & Co., Parties of the Second Part agree that on or before March 31, 1944, they will pay to Parties of the First Part the balance of the consideration due for the purchase of the interest of Parties of the First Part in the firm of Teaford,

Danches & Co., upon the dissolution of said firm. The Parties of the Second Part shall likewise have the right to withdraw from the assets of the firm of Teaford, Danches & Co. or the assets coming into their hands upon the dissolution of said firm of Teaford, Danches & Co., sums sufficient to pay on or before December 15, 1943, and March 15, 1944, the income taxes of said Parties of the Second Part. It is expressly agreed, however, that nothing herein contained shall give to either Parties of the First Part or Parties of the Second Part, the right to withdraw any assets from said firm of Teaford, Danches & Co. if the withdrawal of assets from said firm would violate any of the provisions of the agreement heretobefore [sic] entered into between said firm of Teaford, Danches & Co., and First National Bank in St. Louis, providing for loans by said First National Bank in St. Louis to said firm of Teaford, Danches & Co., which agreement is dated June 30, 1943.

"Section 8.

"Until the First Parties have been paid in full, all checks in the amount of Five Thousand ($5,000.00) Dollars or over, drawn on any of the bank accounts of Teaford, Danches & Co., shall be countersigned by John K. Teaford, except such checks as are drawn to the order of any bank for the purpose of retiring in whole or in part the obligation or obligations of Teaford, Danches & Co. to the drawee.

"Section 9.

"It is further understood and agreed that John K. Teaford shall continue to be employed by the Parties of the Second Part until the first of January, 1944, rendering therefor the services heretofore [sic] rendered and shall draw therefor the same salary that he drew from Teaford, Danches & Co. It is understood and agreed that any and

all salaries that have accrued to the amount of John K. Teaford from Teaford, Danches & Co., as of this date shall be paid to said John K. Teaford."

Under both of the November agreements the consideration to the sellers was $387,500 over and above the aggregate of their capital investment. Appellants reported that portion of the sale price "over and above" their original investment as a capital gain in their respective tax returns for the calendar year 1943. They are on a cash basis. Rejecting that treatment the Commissioner redetermined each petitioner's distributive share of the $387,500 as being taxable as ordinary income. Basically speaking, the Commissioner contended that the several returns were deficient because they left distributable partnership income unreported. Or, as the tax court stated the Commissioner's position: " * * * such amounts (proportionate parts of $387,500) represented a distribution of partnership earnings accrued or accumulated in 1943." Of the Commissioner's contention underlying his disallowance of capital gain treatment the tax court said: " * * * he maintains that no completed sale of the partnership's interest was concluded in 1943 and that, this being true, the income of the partnership accrued normally to the respective partners at the close of the taxable year 1943 pursuant to section 182(c) of the Internal Revenue Code of 1939 [26 U.S.C.A. § 182(c)] and is taxable to them as ordinary income under the provisions of Section 22(a) of the 1939 Code [26 U.S.C.A. § 22(a)]. But, in any event, respondent insists, even if the sale be considered as having occurred in 1943, the aggregate of the amount received over and above the amount of capital investment in the form of consideration, nevertheless, actually represented accumulated partnership income for that year and as such is taxable as ordinary income."

We agree with the tax court which found it unnecessary "to rule on petitioner's contention that all their interest in the partnership represented capital assets * * * since * * * [the tax court did] not agree that a final sale of the interests in question was consummated in 1943." Lucas v. North Star Texas Lumber Co., 1930, 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668; Commissioner of Internal Revenue v. Segall, 6 Cir., 1940, 114 F.2d 706, 709. Certainly until the sale takes place there is no gain or loss for computation. From the documents of record and the testimony it clearly appears that the sale date was postponed "until the Bank consented or until the partnership indebtedness occurred in 1944." The parties' intention, so clearly manifested, is beyond sound debate. Elsinore Cattle Company v. Commissioner, 5 CCH 1950 Fed.Tax Rep. par. 7316(M), Dec. 17516(M) contained no countervailing evidence on the issue of the critical date of sale, quite unlike this appeal.

The judgments of the tax court are affirmed.

Judgments affirmed.

DUFFY, Chief Judge, concurs in the result.