JAMES G. MAXCY AND LOUISE C. MAXCY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 870–71.   Filed March 1, 1973.

*Thomas D. Aitken* and *James W. Ault*, for the petitioners.
*Donald W. Williamson, Jr.*, for the respondent.

#### OPINION

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioners' income tax:

| FYE July 31— | Deficiency |
|---|---|
| 1964 | $1, 898. 17 |
| 1965 | 12, 871. 98 |
| 1966 | 21, 142. 36 |

The parties have stipulated that the issues which remain for decision are as follows:

(a) Whether petitioners are entitled to the investment credit in the amount of $3,500.00 for the fiscal year ended 7/31/64, to the extent needed to offset any deficiency for that period otherwise determined by this Court.

(b) The date of termination of the Maxcy & Maxcy partnership.

(c) The date of termination of the Maxcy Groves partnership.

(d) The date of termination of the Arcadia partnership.

(e) Whether petitioner is entitled to deduct depreciation on assets acquired from [Charles Von Maxcy's] estate and from [Laura Elizabeth Maxcy] using the declining balance method at a rate not exceeding 150% of the straight line rate. [1]

---

[1] This issue has now been conceded by respondent on brief.

(f) At what date is the petitioner entitled to claim depreciation on the assets acquired from [Charles Von Maxcy's] estate and from [Laura Elizabeth Maxcy].

All of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits are incorporated herein by this reference.

James G. Maxcy (hereinafter referred to as the petitioner) and Louise C. Maxcy, husband and wife, resided in Sebring, Fla., at the time of the filing of the petition herein. Joint income tax returns for the years in question as well as for the fiscal years ended July 31, 1967, July 31, 1968, and July 31, 1969, were filed with the district director of internal revenue, Jacksonville, Fla. Amended returns were filed for fiscal years 1964, 1965, and 1969. Louise C. Maxcy is a party to this action solely because she filed joint returns with petitioner for the years in question.

Petitioner, as of October 3, 1966, was a member of three family partnerships:

(a) Maxcy Groves, in which petitioner, his brother, Charles Von Maxcy (hereinafter referred to as Von), and their sister, Laura Elizabeth Maxcy (hereinafter referred to as Elizabeth), were equal partners and equal coowners of the citrus groves and land. The business of the Maxcy Groves partnership consisted of growing and selling citrus fruit.

(b) Maxcy Groves and C. Von Maxcy (a/k/a and hereinafter referred to as the Arcadia partnership), which consisted of Von, who owned a 65-percent interest in the partnership, and the Maxcy Groves partnership, which owned the other 35-percent interest. The principal business of the Arcadia partnership was the growing and selling of citrus fruit.

(c) Maxcy & Maxcy (a/k/a C. V. and J. G. Maxcy Groves), which was owned equally by Von and petitioner at all times pertinent hereto, except that prior to August 1, 1965, Von owned a 60-percent interest therein and petitioner owned the other 40 percent. The principal business of this partnership was also the growing and selling of citrus fruit.

Von was killed on October 3, 1966. At the time of Von's death, there existed no written partnership agreement between or among the partners in any of the three partnerships. Neither was there any agreement, written or otherwise, as to the disposition of a deceased partner's interests in the event of the death of a partner.

Irene H. Maxcy (Von's widow) and the Citizens National Bank of Orlando were appointed coexecutors of Von's estate.

On or about November 8, 1966, Von's executors filed a petition with the County Judge's Court of Highlands County, Fla., which read, in pertinent part, as follows:

2. That your petitioners have not as yet had sufficient time to assemble the information required for an inventory to be filed in said estate, but are aware of the fact that among the assets of the estate are certain partnerships in which decedent was a partner to wit:

(a) C. V. and J. G. Maxcy Groves (½ interest)

(b) Maxcy Groves (⅓ interest)

(c) Arcadia (⅔ interest)

3. In addition to said partnerships decedent owned certain groves and certain equipment pertaining to caretaking and grove operation and marketing.

4. That petitioners are aware of Florida Statutes 733.37 requiring that in the absence of an agreement to the contrary, partnerships will be liquidated upon the death of a partner.

5. That the immediate liquidation of said partnership is not practical now [sic] would it be in the best interests of the estate.

6. That pending an orderly liquidation of said partnerships numerous decisions relating to caretaking, marketing and other matters are necessary to conserve said assets of the estate.

7. That petitioners desire a court order authorizing them to continue the business of the decedent and to participate in the decisions relating to the partnership businesses of decedent.

WHEREFORE, petitioners pray that this Honorable Court authorize them as Executors to continue in behalf of the estate the businesses of decedent and to participate in the business affairs of said interests owned in partnership pending orderly liquidation of said partnerships and disposition thereof in the best interests of the estate.

The parties have stipulated that, in seeking the aforementioned relief, Von's executors were primarily interested in continuing certain businesses other than the partnerships in question and in assuring their participation in any decisions regarding the liquidation of the partnerships and the disposition thereof.

By order dated November 8, 1966, the relief prayed for in the petition was granted and the coexecutors were "ordered, to participate in the business affairs of said interests owned in partnership pending orderly liquidation of said partnerships and disposition thereof, all in the best interests of the estate."

Following Von's death, the business of each of the three partnerships was continued essentially the same as before Von's death. Each of the businesses was managed by petitioner. The coexecutors of Von's estate did not actively participate in the management of any of these business operations, and they advised petitioner almost immediately after Von's death that petitioner was to be responsible for such management. The Citizens National Bank was kept apprised of the operations of the businesses through monthly financial statements furnished by petitioner. In accordance with the advice of petitioner's

counsel, the books of account of each of the three partnerships were, until February 26, 1968, maintained in the same manner as they had been prior to Von's death.

Following Von's death, petitioner made additional contributions to the operating capital of the three businesses. The coexecutors of Von's estate refused to make any such contributions, although the petitioner requested them to do so.

The first meeting at which the liquidation and termination of the three partnerships was discussed by the interested parties was held on February 22, 1967. Among those present at this meeting were the petitioner, Elizabeth, and the coexecutors of Von's estate. At this meeting, among other things, the parties considered liquidating the partnerships as of July 31, 1967. Consideration was also given at this meeting to having either Von's estate or the petitioner purchase the other's interests in the partnerships, but no offer or offers were made by either party at that time.

The next meeting was held on August 22, 1967. At this meeting, an oral offer was made by petitioner to purchase Von's interests in the three partnerships. The offer price was computed in the following manner: The value of Von's interests in the three partnerships as of October 3, 1966, as set forth in the appraisal of the estate of Charles Von Maxcy, deceased, made by Alvin R. Schneider, M.A.I., and L. C. Smith, broker, dated August 10, 1967, was reduced by the petitioner's estimate of the appraiser's overevaluation of Von's interests in the three partnerships as of the date of death, and further reduced by petitioner's estimate of the decline in the value of Von's interests in the three partnerships from October 3, 1966, to July 31, 1967, to arrive at a gross purchase price. The offer also contemplated the following reductions, credits, and setoffs against the gross purchase price:

(a) The estate would pay its pro rata share of the real estate taxes on the partnership properties through July 31, 1967;

(b) The estate would share in the losses sustained by the three businesses up to July 31, 1967;

(c) The petitioner would receive credit for advances he had made to operating capital of the three businesses since the date of Von's death and up to July 31, 1967; and

(d) The estate would pay a share of the proposed salaries of petitioner and Elizabeth for their services to the businesses between the date of Von's death and July 31, 1967.

By letter dated August 29, 1967, Von's executors rejected petitioner's proposal. The letter stated that the major assets of the partnerships had not declined in value since Von's death, that petitioner and Elizabeth were not entitled to any salary for their efforts on behalf of the partnerships since Von's death, that expenditures such as discing

harrowing, and fertilizing the groves for future use should not be charged to the estate, that the payment of an "open end" fee to petitioner's attorneys was not justified because much of their work did not concern itself with partnership businesses, but with matters personal to petitioner and other members of the family, and finally that certain questions existed as to the nature and amount of advances made by petitioner to the partnerships.

The interested parties met again on September 21, 1967. At this meeting, the coexecutors of the estate advised the petitioner that Von's interests in the three partnerships must be valued as of the date of Von's death in computing the purchase price. The reason given the petitioner by the coexecutors for reverting back to the date of death was that, in the legal opinion of counsel for the Citizens National Bank of Orlando, the partnerships had to be dissolved as of the date of Von's death under the laws of the State of Florida. The petitioner thought, however, that the coexecutors' reason for insisting on a date-of-death valuation was that it would be a more advantageous valuation date for the estate.

Between September 21, 1967, and October 5, 1967, negotiations continued, with the result that, by letter dated October 5, 1967, the coexecutors of the estate made an offer to sell Von's interests in the three partnerships to petitioner for $295,000 cash (subject to certain adjustments) plus the estate's proportionate share of proceeds "from the partnerships' fruit now in participation for the 1966–67 season." The offer called for petitioner to pay additional consideration in the form of the discharge and satisfaction of all partnership obligations, petitioner's and Elizabeth's release of their claims for compensation for services rendered the partnerships since the date of Von's death, and the complete and full agreement of petitioner and Elizabeth "that the Estate is to bear no share of the expenses and losses of the partnerships subsequent to October 3, 1966." This offer was followed by further negotiations, as a result of which the parties reached an oral agreement, which was reduced to writing in the form of a letter from petitioner to the coexecutors and signed by them, dated October 19, 1967. In that letter, petitioner agreed to purchase the estate's interests in the partnerships for $286,000 cash "less the Estate's share of any principal and interest due as of closing on the Florida Citrus Production Credit Association obligations, plus the Estate's proportionate part of the 1966–1967 participation fruit proceeds as said monies are received." [2]

---

[2] Participation fruit proceeds consisted of the proceeds of any fruit picked during a particular season, in this case, the 1966–67 fruit season.

Valuation of the estate's interests was established as of October 3, 1966. Petitioner also agreed to the following:

1. Complete and full satisfaction of all claims, including interest, by all partnerships, himself, his wife, his sister Elizabeth, and Mary V. Maxcy, against either Von Maxcy, Inc.,[3] or the estate;

2. Either pay or assume and agree to pay in full a promissory note for $45,000 in favor of The First National Bank of Orlando and signed by Von, petitioner, and Elizabeth;

3. Release and satisfaction of any claim petitioner or Elizabeth had for compensation from the partnerships for any post-death services rendered; and

4. Complete and full agreement of petitioner and Elizabeth that the estate was to bear no share of the expenses or losses from operations of the partnerships subsequent to October 3, 1966.

The performance of the October 19, 1967, letter agreement contained the following:

> Of course you [the coexecutors] understand from our many discussions, that this offer is conditioned upon the successful conclusion of my [petitioner's] negotiations for funds from a lender who tentatively committed them to me quite some time ago. I have no reason to believe that the loan still cannot be consummated. *But if the financing arrangements prove impossible, then I will not be bound by this offer to purchase.* Similarly, I understand you all have entered this agreement subject to approval by the County Judge for Highlands County, Florida. I presume that you will immediately petition the Court for its approval of this transaction. When you have notified me of the Court's approval, *we can schedule a tentative closing date* and discuss some satisfactory means to obtain satisfaction of the obligations you hope to have satisfied before October 31, 1967. [Emphasis added.]

On October 24, 1967, the coexecutors petitioned the County Judge's Court for an order "allowing them to sell said property."[4] On October 30, 1967, the court issued an order in which the coexecutors were—

> authorized, to sell the following described property at private sale to James G. Maxcy:
>
> Maxcy & Maxcy_____50%
> Maxcy Groves and C. Von Maxcy Estate_____65%
> Maxcy _____33⅓%
>
> the said sale to be made in accordance with the Contract attached to the Petition for this Order.

At some point of time following completion of the negotiations with the coexecutors for the purchase of Von's interests in the three partnerships, and prior to February 26, 1968, the petitioner and Elizabeth reached an agreement for the purchase by petitioner of Elizabeth's

---

[3] 83.33 percent of the outstanding stock of Von Maxcy, Inc., was owned by Von at the time of his death.

[4] The petition for court approval noted that Von's interests in the partnerships were valued at $398,000 on the date of Von's death and that they were being sold for $406,000.

interests in the partnerships. The basis of valuation for Elizabeth's interests was the same as that utilized in valuing the estate's interests in the partnerships.

On February 26, 1968, the date of closing, the acquisition by petitioner of the partnership interests owned by the estate and Elizabeth was finalized by the execution of a document entitled "Partnership Termination Agreements" entered into by and between petitioner, Elizabeth, Von's widow, acting individually, and the coexecutors of Von's estate. The letter agreement of October 19, 1967, served as the basis for this document.

The preamble to this document recited that Von's death dissolved the partnerships and that the purchase of the estate's and Elizabeth's interests in the partnerships was "in lieu of a liquidation or in-kind distribution of the partnerships' assets and in lieu of a final accounting of the partnerships."

This agreement provided, in pertinent part, that, with respect to petitioner's purchase of the estate's interests in the partnerships, petitioner would pay $286,000 plus the estate's share of participation fruit proceeds from the 1966–67 season. In addition, petitioner agreed to satisfy any and all claims the partnerships, petitioner, his wife, his sister Elizabeth, or Mary V. Maxcy might have against either the Estate or Von Maxcy, Inc., satisfaction of the estate's liability on obligations to the Gulf-Atlantic Citrus Production Credit Association as of the date of death, and payment in full of a $45,000 note to the Orlando Bank, upon which the signatures of Von, Elizabeth, and petitioner appear.

With respect to the purchase of Elizabeth's interests, petitioner agreed to pay $14,747 plus Elizabeth's share of the 1966–67 participation fruit proceeds; to execute a $15,000 note, with interest at 7 percent, in favor of Elizabeth, payable in three equal installments commencing February 23, 1969; to repay a $10,000 loan Elizabeth received from Arcadia; and to convey the "JGM 20 acre grove" to Elizabeth, with taxes thereon to be prorated from October 1, 1966 through 1967.

With respect to both purchases, petitioner assumed and agreed to pay all debts, obligations, and liabilities existing on or arising after October 3, 1966, and pay the estate's share of all closing costs involved in the liquidation and termination of the partnerships; Elizabeth paid her share of the closing costs with regard to the termination of Maxcy Groves only. All parcels of realty were transferred to petitioner by way of deeds dated February 23 or 26, 1968, and recorded on February 26, 1968. The three partnerships in question were declared terminated as of October 3, 1966. Except for their share of participation fruit proceeds and the payments required thereunder, the document

provided that the estate and Elizabeth "are to share in none of the profits and to bear none of the expenses or losses from the operation of the former partnership properties subsequent to October 3, 1966."

On the same day that the document was executed (February 26, 1968), Elizabeth, Von's widow, acting individually, and the coexecutors of Von's estate conveyed to petitioner by bill of sale all grove equipment and other personal property, as well as all fruit then growing in the groves, owned by the three partnerships and, in addition, assigned to petitioner all proceeds from sales of fruit for the growing season 1967–68 whether theretofore paid or not.

The petitioners, on their joint income tax returns filed for the taxable years July 31, 1967, and thereafter, treated the partnerships as having terminated for Federal income tax purposes on October 3, 1966, with the result that they included all income (except the estate's share of the 1966–67 fruit participation proceeds) and claimed all expenses and losses realized, incurred, or sustained in the partnership operations subsequent to Von's death on October 3, 1966. Petitioners' return for fiscal 1967 was filed on or about April 18, 1968. The income tax returns filed by Elizabeth (for calendar years 1966 and subsequent) and for Von's estate (for taxable years ended September 30, 1967, and subsequent) similarly reflected such income, expenses, and losses as belonging to petitioner, except that Elizabeth's return for calendar year 1966 showed only her share of income in the Maxcy Groves partnership for the period ending July 31, 1966. The first such return for Von's estate covered the fiscal year October 3, 1966, to September 30, 1967, but was not filed until April 16, 1968, i.e., after the February 26, 1968, agreement had been executed. The record does not contain the final income tax return of Von nor does it indicate when Elizabeth's 1966 return was filed.

On Schedule F of the estate tax return filed by the coexecutors of Von's estate between January 16 and April 3, 1968, each of the partnership interests was listed as an asset not disposed of within 1 year following Von's death, with the statement that the "Executors have entered into an *agreement for sale*" (emphasis added) for a specified amount.

On or about April 15, 1968, the petitioners filed a claim for refund in the amount of $3,500 for the fiscal year ended July 31, 1964, on the ground that an investment credit in that amount was not claimed on their amended joint return for that year. Respondent has taken no action on this claim, but both parties agree that the claim was untimely filed. Respondent concedes that, had this claim been timely filed by the petitioners under the applicable statute of limitations, the amount of $3,500 claimed as a refund therein would have been allowed.

On or about April 22, 1968, the petitioners filed an Application for Tentative Carryback Adjustment resulting from a net operating loss and unused investment credit claimed for the fiscal year ended July 31, 1967. As a result of this application, tentative refunds were made by respondent to the petitioners for the entire amount of income tax ($11,282.39) paid for the fiscal year ended July 31, 1964, the entire amount of income tax ($12,498.94) paid for the fiscal year ended July 31, 1965, and $1,514.66 of the $13,256.34 income tax paid for the fiscal year ended July 31, 1966.

On or about November 15, 1968, the petitioners filed another Application for Tentative Carryback Adjustment resulting from a net operating loss claimed for the fiscal year ended July 31, 1968, as a result of which a tentative refund was made by respondent in the amount of $11,469.14, representing the balance of the $13,256.34 income tax paid by the petitioners for the fiscal year ended July 31, 1966, less the $1,514.66 tentatively refunded pursuant to the prior application referred to in the above paragraph.

Also on or about November 15, 1968, the petitioners filed a claim for refund in the amount of $272.54 for the fiscal year ended July 31, 1966, on the ground that the investment credit of $1,361.01 claimed on the original July 31, 1965, joint return filed by the petitioners was no longer needed in the fiscal year ended July 31, 1965, due to the net operating loss carryback from the fiscal year ended July 31, 1967, to the fiscal year ended July 31, 1965, pursuant to the application of April 22, 1968, and the $1,361.01 investment credit was therefore allowable as a carryforward to the fiscal year ended July 31, 1966. Respondent has taken no action on this claim; he concedes, however, that the claim is allowable as a credit or refund, as the case may be.

*Issue 1. Termination of the Three Partnerships*

We are first asked to determine when the partnerships in question terminated within the meaning of section 708(a) and section 708(b) (1).[5] Respondent contends that they did not terminate before February 26, 1968, the date of the so-called partnership termination agreements. Petitioner contends they terminated on October 3, 1966, the date of Von's death and the date used to value the assets purchased by petitioner from his partners. At stake is the amount of petitioner's share of the losses incurred by the partnership businesses subsequent to Von's death and the point of time from which petitioner may commence depreciating the partnership assets purchased from his partners at the 150-percent rate. Alternatively, petitioner suggests

---

[5] All references are to the Internal Revenue Code of 1954, as amended.

that the agreement of October 19, 1967, retroactively allocated all profits and losses of the partnership for its final 2 years to petitioner.

Section 708(a) provides that an existing partnership shall be considered as continuing unless terminated. Section 708(b)(1) provides that a partnership shall be terminated only if—

(A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or

(B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.

Petitioner's arguments seek to invoke section 708(b)(1)(A), while respondent asserts that section 708(b)(1)(B) is the operative provision under the circumstances herein.

Petitioner stresses that only he participated in the managing and financing of the partnership businesses subsequent to Von's death, only he was to account for post-death profits and losses, and, finally, that date-of-death values were used in determining the purchase price of the partnership assets. As a result, he contends that the partnerships terminated on Von's death because from and after that date all activities were carried on solely by himself and not by "any * * * partner *in a partnership.*" (Emphasis added.)

Petitioner asserts that, in the instant case, there was no process of "winding up" or liquidation of the partnership businesses following Von's death in which it could be said that the estate continued to participate as a partner and that the termination of the partnership was postponed until the completion of that process. Cf. *Kinney* v. *United States*, 228 F. Supp. 656, 663–664 (W.D. La. 1964), affirmed per curiam 358 F.2d 738 (C.A. 5, 1966); *David A. Foxman*, 41 T.C. 535, 556–557 (1964), affirmed on another issue 352 F.2d 466 (C.A. 3, 1965); *Estate of Guy B. Panero*, 48 T.C. 147, 155 (1967); *Elaine Yagoda*, 39 T.C. 170, 183 (1962), affd. 331 F.2d 485, 491 (C.A. 2, 1964). But it does not follow from this assertion, even if true, that there was no "business of the partnership * * * carried on by any of the partners in a partnership."

Clearly, the coexecutors of Von's estate asked for and received the broadest authority from the Florida County Court to continue "all businesses of the decedent" and "participate in the business affairs of [the partnership] pending orderly liquidation." See also Fla. Stat. Ann. sec. 733.08 (1945). Their continued participation is further confirmed by the fact that petitioner accounted to them monthly in respect of the operations of the businesses. It is equally clear from our findings that there was a lengthy and tortuous process of negotiations before the rights and obligations of petitioner, Von's estate, and Elizabeth were finally defined.

Petitioners' attempts to counteract these critical factors miss the mark. To be sure, petitioner was responsible for the management of the businesses, but such responsibility is not to be equated with the existence of a sole proprietorship, cf. *Austin* v. *United States*, 461 F.2d 733, 737 (C.A. 10, 1972); in this respect, petitioner's status was comparable to that of a managing partner functioning on behalf of himself and his copartners, for which he was obligated to (and, in fact, did) account. Cf. *Biers* v. *Sammons*, 242 So. 2d 158 (Fla. Dist. Ct. App. 1970), and cases cited therein. Similarly, the fact that the coexecutors refused to make additional contributions to the operating capital of the three businesses is not the equivalent of an absence of sharing of profits and losses. Petitioner can draw little, if any, sustenance from the fact that the various parties reported the profits and losses of the three partnerships in a manner consistent with termination on October 3, 1966; most, if not all, the returns were filed subsequent to February 26, 1968, i.e., after the definitive arrangements were finalized,[6] and Elizabeth's 1966 return did not include any item in respect of Maxcy Groves for the period August 1 to October 3, 1966. Finally, the fact that the interests of the estate and Elizabeth were valued as of October 3, 1966, in order to determine the amount to be paid simply reflects their belief that their interests were worth at least that much of the time of the buyouts.

In short, other than by way of hindsight, the conclusion that the partnership terminated as of October 3, 1966, is belied by the facts herein. We think it clear beyond peradventure that both the estate and Elizabeth retained their respective interests in the partnerships until well after that date. Cf. *Frederich* v. *Commissioner*, 145 F.2d 796 (C.A. 5, 1944), reversing on other grounds 2 T.C. 936 (1943); *Estate of Guy V. Panero, supra; David A. Foxman, supra.* Compare Fla. Stat. Ann. sec. 733.37 (1951). Had the values sharply increased or decreased, we have little doubt that such fluctuations would have been reflected in the ultimate purchase price.

The case of *Knipp's Estate* v. *Commissioner*, 244 F.2d 436 (C.A. 4, 1957), affirming 25 T.C. 153 (1955), relied on by petitioners, is not in point. In that case, there was a *preexisting* partnership agreement which provided for a buyout in the event of death and for the immunization of the deceased's estate from sharing in profits or losses. The same condition obtained in Rev. Rul. 54-55, 1954-1 C.B. 153, also cited by petitioner.

The question remains, however, as to when the three partnerships were in fact terminated. Resolution of this question turns upon when

---

[6] The date of the filing of the three partnership returns for the period Aug. 1 to Oct. 3, 1966, does not appear in the record, but the date of signature of the preparer of the returns is Apr. 5, 1968.

there was a sale of 50 percent or more of the total interest in each of the partnerships within the meaning of section 708(b)(1)(B). Three possible dates suggest themselves, i.e., October 19, 1967, October 30, 1967, and February 26, 1968.

As far as the partnership interests of the estate are concerned, the letter agreement of October 19, 1967, embodying petitioner's offer and its acceptance by the coexecutors of Von's estate, was specifically conditioned upon court approval and petitioner's obtaining sufficient financing to consummate the purchase. The court approval was obtained on October 30, 1967, but such approval, by its terms, merely "authorized" the sale; it did not approve a consummated sale or operate by itself to accomplish a sale. Moreover, the estate tax return filed by the coexecutors at some undisclosed date after January 16, 1968,[7] spoke in futuro, i.e., of an "agreement *for* sale." (Emphasis added.) With respect to the fulfillment of petitioner's requirement of financing, the record contains no indication of when this was accomplished and it is clear that the October 19, 1967, agreement was not binding until that substantial condition was satisfied; under the circumstances, the agreement of October 19, 1967, constituted nothing more than an option to purchase in favor of petitioner. Cf. *Chapin* v. *Commissioner*, 180 F.2d 140 (C.A. 8, 1950); *Stiver* v. *Commissioner*, 90 F.2d 505 (C.A. 8, 1937). Compare *Teaford* v. *Commissioner*, 246 F.2d 73 (C.A. 7, 1957); *LeSage* v. *Commissioner*, 173 F.2d 826 (C.A. 5, 1949), affirming on this issue a Memorandum Opinion of this Court.

The only evidence with regard to when agreement upon terms of purchase of Elizabeth's interests was first reached indicates that it occurred at some undetermined date after negotiations with the estate were concluded, but no later than February 26, 1968. On the basis of the record before us, the only conclusion to be drawn is that the sale of her interest occurred on February 26, 1968; we would be making a wild guess to set the date earlier.

Taking into account all the facts and circumstances, we conclude that sales of the partnership interests in question did not occur until February 26, 1968. *Edwin E. McCauslen*, 45 T.C. 588 (1966). Our conclusion is in no wise impaired by any rationale based upon the argument that petitioner was in possession and control of the partnership assets. Compare, e.g., *Clodfelter* v. *Commissioner*, 426 F.2d 1391 (C.A. 9, 1970), affirming 48 T.C. 694 (1967); *Pacific Coast Music Jobbers, Inc.*, 55 T.C. 866 (1971), affd. 457 F.2d 1165 (C.A. 5, 1972); *Ted F. Merrill*, 40 T.C. 66, 74 (1963), affirmed per curiam 336 F.2d 771 (C.A. 9, 1964). Petitioner's possession and control herein prior to February 26, 1968, was not as a purchaser but as a partner.

---

[7] By letter of that date, the coexecutors were granted an extension of time to file the estate tax return to Apr. 3, 1968.

Petitioners alternatively contend that if we find that the partnerships did not terminate on October 3, 1966, the partnership agreements were amended prior to November 15, 1967, to provide that only petitioner would be entitled to the profits and would bear the losses of the partnerships after October 3, 1966 (other than certain fruit participation proceeds, see fn. 2 *supra*), and that this amendment was effective under section 761(c)[8] in respect of the partnership fiscal years ended July 31, 1967, which included the October 3, 1966, date. His argument runs as follows: Section 702(a) requires each partner to take into account his distributive share of partnership income or losses in determining his personal income tax; section 704(a) provides that the partnership agreement generally determines each partner's share of income, or loss; and section 761(c) allows an amendment of the partnership agreement to be retroactive under certain circumstances.[9]

The petition herein, which, according to Rule 7, Tax Court Rules of Practice, must state all assignments of error and the facts upon which error is alleged in a clear and concise manner, is worded only in terms of when did the partnership terminate, the date from which petitioner may take depreciation on the purchased assets, and the availability of an unused investment credit. In addition, the parties stipulated the issues which were submitted to us for consideration. The first time this issue of retroactive allocation appeared was in petitioners' original brief. It is well established that this Court will not consider issues first raised on brief and not appearing in the pleadings. *Sidney Messer*, 52 T.C. 440 (1969), affd. 438 F. 2d 774 (C.A. 3, 1971); *Eleanor Shomaker*, 38 T.C. 192, 201 (1962); *William Greenberg*, 25 T.C. 534 (1955). We think this principle is particularly applicable in this case in view of the interrelationship between section 761(c) and the existence of a "principal purpose of * * * avoidance or evasion of tax" in respect of a provision in the partnership agreement as provided in section 704(b)(2). There are potential factual elements involved which might well have resulted in a different focus to the instant case, including the possibility that it would not have been fully stipulated.[10]

*Issue 2. Depreciation*

Our analysis as to when the partnerships terminated disposes of the issue of the date of acquisition by petitioner of the assets representing

[8] SEC. 761. TERMS DEFINED.

(c) PARTNERSHIP AGREEMENT.—For purposes of this subchapter, a partnership agreement includes any modifications of the partnership agreement made prior to, or at, the time prescribed by law for the filing of the partnership return for the taxable year (not including extensions) which are agreed to by all the partners, or which are adopted in such other manner as may be provided by the partnership agreement.

[9] The partnership agreement and/or any modification thereof may be oral or written. Sec. 1.761-1(c), Income Tax Regs.

[10] Compare *Jean Kresser*, 54 T.C. 1621, 1631 fn. 5 (1970), with *Smith v. Commissioner*, 331 F. 2d 298, 301 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court. Compare also *Stanley C. Orrisch*, 55 T.C. 395 (1970).

the partnership interests of Elizabeth and Von's estate for purposes of determining the point of time from which petitioner may commence depreciating those assets. That date is February 26, 1968. *Edwin E. McCauslen, supra.*

## Issue 3. Unused Investment Credit

The deficiency asserted by respondent for fiscal 1964 is predicated upon his determination that petitioner overstated the amount of his fiscal 1967 net operating loss which could properly be carried back to the earlier year and that, consequently, respondent made an erroneous tentative refund of $1,698.17 of petitioner's tax for such earlier year. Our disposition of the prior issues herein largely sustains respondent's determination that the claimed fiscal 1967 net operating loss was overstated, with the consequence that there was an erroneous tentative refund in respect of fiscal 1964 which was timely determined to be a deficiency by respondent on November 12, 1970, pursuant to the provisions of section 6501. Petitioners seek to resist the determination of such deficiency by claiming the benefit of such portion of a $3,500 investment credit as will reduce respondent's claim for fiscal 1964 to zero. They do not seek a decision by this Court that they are entitled to a credit or refund of any excess of such credit over the amount of respondent's claim based upon the smaller 1966 net operating loss carryback. Petitioners did not take advantage of such credit on their fiscal 1964 tax return and they did not file a timely claim for refund in respect thereof. Respondent resists petitioners' effort to reduce the deficiency on the ground that any such reduction is barred by the period of limitations applicable to refunds specified in sections 6511 (a) and (b) and 6512(b)(2).

As we see it, the critical problem in resolving the issue thus presented is what elements may we properly take into account in deciding whether a "deficiency" exists for fiscal 1964. If respondent's determination of a deficiency for that year had been made within the normal period of limitations (in this case, within 3 years from the filing of the return), there would be no problem. Clearly, under such circumstances, petitioner would be entitled to resist respondent's determination on any ground, irrespective of whether it had formed the basis of a claim on their tax return or of the determination of a deficiency by respondent. *Vincent A. Marco,* 25 T.C. 544, 549 (1955); *Estate of Mary E. Jackman,* 2 B.T.A. 515 (1925).[11] Prior to 1966, however, the situation with respect to net operating loss carrybacks was more restricted. Respondent could assert deficiencies, after the

---

[11] Indeed, petitioner would have been enabled under such circumstances to seek a determination of an overpayment for 1964 by this Court in accordance with the provisions of sec. 6512(b).

expiration of the normal period of limitations, in respect of erroneous allowances of refunds made in response to applications for tentative net operating loss carryback adjustments only to the extent that such deficiencies were "attributable" to the carryback. Sec. 6501(h); sec. 6213(b)(2); *Ione P. Bouchey*, 19 T.C. 1078 (1953); *Edward G. Leuthesser*, 18 T.C. 1112 (1952). Cf. *Bunn's Auto Sales, Inc.*, 35 T.C. 861 (1961).[12] Taxpayers were similarly limited in their ability to resist the determination of such deficiencies. *Deakman-Wells Co.* v. *Commissioner*, 213 F. 2d 894, 899 (C.A. 3, 1954), reversing on another issue 20 T.C. 610 (1953); *United Surgical Steel Co.*, 54 T.C. 1215, 1226–1227 (1970).

In 1966, Public Law 89–721, 89th Cong., 2d Sess. (80 Stat. 1150 (Part 1)), added section 6501(m) to the Internal Revenue Code, which provides as follows:

(m) TENTATIVE CARRYBACK ADJUSTMENT ASSESSMENT PERIOD.—In a case where an amount has been applied, credited, or refunded under section 6411 (relating to tentative carryback adjustments) by reason of a net operating loss carryback, or an investment credit carryback, to a prior taxable year, the period described in subsection (a) of this section for assessing a deficiency for such prior taxable year shall be extended to include the period described in subsection (h) or (j), whichever is applicable; except that the amount which may be assessed solely by reason of this subsection shall not exceed the amount so applied, credited, or refunded under section 6411, reduced by an amount which may be assessed solely by reason of subsection (h) or (j), as the case may be.

By virtue of that section, deficiencies in respect of erroneous tentative carryback adjustments were permitted on grounds not attributable to the carryback so long as the deficiency determined did not exceed the amount of the refund reduced by any amount that in fact is attributable to the carryback. H. Rept. No. 2161, 89th Cong., 2d Sess., p. 4 (1966); S. Rept. No. 1709, 89th Cong., 2d Sess., p. 4 (1966). Thus, the prior transactional limitations involved in the determination of such deficiencies were eliminated.[13] The section was made applicable to any case where the application for tentative carryback adjustment was filed after November 2, 1966, which is the situation herein.

The broadening of the grounds upon which such deficiencies could be determined by respondent accomplished a similar expansion of

---

[12] Respondent has been afforded a broader scope in defending against suits for refund by a taxpayer based upon a net operating loss carryback to an otherwise barred year. *Commissioner* v. *Van Bergh*, 209 F. 2d 23 (C.A. 2, 1954), reversing on another issue 18 T.C. 518 (1952). Compare *Lewis* v. *Reynolds*, 284 U.S. 281 (1932).

[13] Such transactional limitations would appear to continue to be applicable to deficiencies asserted under sec. 6501(b) in respect of payments made in response to "regular" (as distinguished from "tentative") claims for refund based upon net operating loss carrybacks. *Ione P. Bouchey*, 19 T.C. 1078 (1953); *Edward G. Leuthesser*, 18 T.C. 1112 (1952).

the elements which we may properly take into account in deciding what the amount of the deficiency should, in fact, be, subject to the qualification that we cannot reduce the amount below zero and determine that a taxpayer has made an overpayment of tax for the otherwise barred year. See *Springfield Street Railway Co.* v. *United States*, 312 F. 2d 754, 759 (Ct. Cl. 1963). The definition of a deficiency is contained in section 6211.[14] Subsection (b) of section 6211 excludes certain credits against tax from the determination of the amount of a deficiency, but the investment credit is not so excluded and, consequently, may be taken into account.

In view of the foregoing, we hold that petitioners are entitled to a credit for that portion of the $3,500 investment credit for 1964 which does not exceed the amount to which respondent may otherwise be found to be entitled for that year by virtue of the Rule 50 computation.

Because of the numerous concessions made by both parties and to reflect our decision herein with respect to the availability to petitioners of the unused investment credit for fiscal 1964,

*Decision for all years will be entered under Rule 50.*[15]

---

[14] SEC. 6211. DEFINITION OF A DEFICIENCY.

(a) IN GENERAL.—For purposes of this title in the case of income, estate, gift, and excise taxes, imposed by subtitles A and B, and chapter 42, the term "deficiency" means the amount by which the tax imposed by subtitle A or B or chapter 42 exceeds the excess of—
  (1) the sum of
    (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus
    (B) the amounts previously assessed (or collected without assessment) as a deficiency, over—
  (2) the amount of rebates, as defined in subsection (b)(2), made.
(b) RULES FOR APPLICATION OF SUBSECTION (a).—For purposes of this section—
  (1) The tax imposed by subtitle A and the tax shown on the return shall both be determined without regard to payments on account of estimated tax, without regard to the credit under section 31, and without regard to so much of the credit under section 32 as exceeds 2 percent of the interest on obligations described in section 1451.
  (2) The term "rebate" means so much of an abatement, credit, refund, or other repayment, as was made on the ground that the tax imposed by subtitle A or B or chapter 42 was less than the excess of the amount specified in subsection (a)(1) over the rebates previously made.
  (3) The computation by the Secretary, or his delegate, pursuant to section 6014, of the tax imposed by chapter 1 shall be considered as having been made by the taxpayer and the tax so computed considered as shown by the taxpayer upon his return.
  (4) The tax imposed by subtitle A and the tax shown on the return shall both be determined without regard to the credit under section 39, unless, without regard to such credit, the tax imposed by subtitle A exceeds the excess of the amount specified in subsection (a)(1) over the amount specified in subsection (a)(2).

[15] The stipulation of the parties makes a passing reference to a possible question as to the availability to petitioner of a net operating loss for fiscal year 1969 as a carryback to fiscal 1966. Petitioners appear to have abandoned any claim in respect thereto on brief. In any event, we have no evidence that such a net operating loss occurred or, if it did, the amount thereof, and we do not read the stipulation as a concession by respondent as to either of these two conditions. Consequently, any such loss cannot be taken into account, assuming, without deciding, that we would be entitled so to do. Cf. *Springfield Street Railway Co.* v. *United States*, 312 F. 2d 754 (Ct. Cl. 1963). But compare *Yellow Cab Co.* v. *Commissioner* (C.A. 7, 1965, 16 A.F.T.R. 2d 5457, 65–2 U.S.T.C. par. 9568), reversing 43 T.C. 125 (1964), with *Raymond Spector*, 42 T.C. 110, 113 (1964).