123 T.C. No. 4


UNITED STATES TAX COURT



HARBOR COVE MARINA PARTNERS PARTNERSHIP,
ROBERT A. COLLINS, A PARTNER OTHER THAN THE TAX
MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL
REVENUE, Respondent


Docket No. 13267-02.              Filed July 15, 2004.


     H is a general partnership, its managing partner
is S, and its other two partners are M and P.  H's
business activity is primarily the operation of a
marina in San Diego, California.  On account of
dissension that consistently occurred between S and P
as to H's operation of the marina, S, in its capacity
as H's managing partner, dissolved H, distributed the
marina to S or to an S affiliate, distributed to P a
check in the amount of the value of P's interest in H
as ascertained using a $16.5 million appraised value
for the marina, and reported to R that H had
terminated.  S's actions, all of which occurred in
1998, violated H's partnership agreement which required
that H's managing partner sell the marina publicly to
the highest bidder in the event of a dissolution and
that the proceeds of the sale be distributed to the
partners in accordance with the interests stated in the
agreement.  P disavowed that H had terminated, sued S

to compel S to abide by the partnership agreement, and deposited with the trial court the check that P had received from H.  In 2000, the trial court declared that the partnership agreement required that S sell the marina publicly to the highest bidder, but decided that P's sole remedy for S's violation of that agreement was to withdraw the funds on deposit.  P withdrew those funds shortly thereafter.  In 2002, upon appeal of the trial court's judgment, the court of appeal ordered that the marina be sold and that the proceeds be distributed in accordance with the partnership agreement.  In 2003, after the marina had been sold for $25.5 million, but before any distribution of the resulting proceeds, the trial court decided upon remand that P's withdrawing of the funds formerly on deposit meant that the court of appeal's order was without any legal basis and that the final judgment in P's lawsuit was the trial court's judgment stating that P was only entitled to the withdrawn funds.  The trial court's latest decision is back on appeal before the court of appeal.

Held:  Pursuant to sec. 708(b)(1)(A), I.R.C., H did not terminate for Federal tax purposes during 1998; as of the end of that year, H's winding up of its affairs in complete cessation of its business operation was dependent on the resolution of P's lawsuit as to the failure of S to follow the procedures by which the partners of H had agreed that H's operation would be terminated, and P's lawsuit, when resolved, could have under the partnership agreement reasonably resulted in H's realization of significant income, credit, gain, loss, or deduction after 1998.

W. Alan Lautanen, for petitioner.

Karen Nicholson Sommers, for respondent.

OPINION

LARO, Judge:  This case is a partnership proceeding subject to the unified audit and litigation procedures of the Tax Equity

& Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324, 628. It is currently before the Court for decision without trial. See Rule 122; see also sec. 6226(b).[1] When the tax matters partner of Harbor Cove Marina Partners (HCMP) did not petition this Court under section 6226(a) within the 90-day period stated therein, Robert A. Collins (Collins), a notice partner of HCMP, petitioned the Court under section 6226(b) to readjust partnership items relating to the Notice of Final Partnership Administrative Adjustment (FPAA) issued by respondent for HCMP's 1998 taxable year. The FPAA reflects respondent's determination that the "final" 1998 Form 1065, U.S. Partnership Return of Income (1998 partnership return), filed by HCMP is correct and that respondent would make no changes to it.

Collins filed a personal 1998 Form 1040, U.S. Individual Income Tax Return (1998 individual income tax return). He included in that return a Form 8082, Notice of Inconsistent Treatment or Administrative Adjustment Request (AAR), as to four positions taken by HCMP in its 1998 partnership return. Collins indicated on the Form 8082 that he was filing inconsistently with those positions because they reflected HCMP's erroneous belief that it had terminated during 1998. According to Collins, HCMP continues to exist today pending the final outcome of his lawsuit

---

[1] Rule references are to the Tax Court Rules of Practice and Procedure. Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code.

(lawsuit) against HCMP's managing general partner and others. The lawsuit, which is currently before the California Court of Appeal for the Fourth Appellate District (court of appeal), seeks enforcement of a provision in HCMP's partnership agreement (and a directive of the court of appeal) that requires that HCMP sell its assets in the public market rather than distribute those assets to its managing general partner (or to an affiliate of that partner), as was done at the time of HCMP's reported termination.

Collins sets forth in his petition to this Court certain allegations of error which he did not address on brief. We consider those allegations to be conceded. We are left to decide whether HCMP terminated during 1998. We hold it did not.[2]

## Background

The facts in this background section are obtained from the parties' stipulation of facts, the exhibits submitted therewith, and the pleadings. HCMP is a general partnership whose principal place of business was in San Diego, California, when Collins's petition to this Court was filed.

---

[2] The parties also dispute whether Collins correctly reported the other three "inconsistent positions" listed in his Form 8082. We believe that we need not decide this dispute, given our holding that HCMP was not terminated during 1998. If either party disagrees, he should bring this to our attention during the parties' discussion of the computations to be submitted to the Court under Rule 155.

HCMP was formed on April 8, 1985, under the Uniform Partnership Act of California. It is governed by a written partnership agreement (partnership agreement) executed on that date and entitled "Restated Partnership Agreement of Harbor Cove Marina Partners". Among its purposes under the partnership agreement are to acquire, own, commercially develop, and hold for investment and the production of income a leasehold interest in certain real property owned by the San Diego Unified Port District (Port District). Another purpose is to develop a marina (marina) on that leasehold and to hold that marina for investment. Its term as stated in the partnership agreement expires no later than December 31, 2020.

HCMP's partnership agreement was signed by (or, in the case of a corporation, on behalf of) its initial partners; namely, Collins, Charles B. Hope (Hope), Frank L. Hope, Jr. (Hope Jr.), and a California corporation named Sunroad Marina, Inc. (Sunroad corporation). The partnership agreement stated that Sunroad corporation was HCMP's managing general partner and tax matters partner, that Sunroad corporation owned a 70-percent interest in HCMP, and that the other three partners each owned a 10-percent interest in HCMP. The partnership agreement stated that the partners shared in each item of income, expense, gain, loss, and credit in accordance with their ownership interests and that, on liquidation and distribution, the shares of Collins, Hope,

Hope Jr., and Sunroad corporation were 12, 12, 12, and 64 percent, respectively. The partnership agreement also stated as to the partners' business relationship extensive details on, among other things, the manner in which HCMP shall acquire its capital, the manner in which HCMP shall allocate its profits and losses, the manner in which HCMP shall be dissolved, and the manner in which HCMP shall be liquidated following its dissolution.

On or about January 30, 1987, HCMP agreed to lease from the Port District 1,315,440 square feet of tideland area located on Harbor Island Drive in San Diego, upon which HCMP would construct the marina. The underlying lease (marina lease) was signed by each HCMP partner and stated that the tideland area was let for a 40-year period beginning February 1, 1987. On or about March 16, 1988, the Mutual Life Insurance Company of New York (MONY) lent $13.5 million to HCMP (MONY loan) to acquire and develop the marina. The MONY loan was nonrecourse, and it was secured by an interest in the marina lease granted to MONY by HCMP. Each HCMP partner signed and executed in favor of MONY a single $13.5 million promissory note ($13.5 million promissory note), the terms of which were governed and construed by California law.

The partnership agreement provided that the managing general partner had the sole right to manage HCMP's business. During HCMP's existence, Collins vigorously challenged many of the

decisions made by Sunroad corporation as to that business.  This
animosity led to Sunroad corporation's suing Collins in San Diego
Superior Court in an attempt to compel a buyout of his HCMP
interest.  This litigation ended unfavorably to Sunroad
corporation.

On or about November 19, 1996, Sunroad corporation assigned
its interest in HCMP to Sunroad Real Estate Holding Corporation
(Sunroad Real Estate) to reflect a change in name from the former
to the latter.  Approximately 8 months later, in or about August
1997, Hope and Hope Jr., sold their interests in HCMP to Marina
Holdings Partners, L.P. (Marina Holdings), a California limited
partnership that was formed on May 29, 1997.[3]  On or about
December 31, 1997, Sunroad Real Estate was liquidated, and its
HCMP interest was assigned to Sunroad Asset Management, Inc.
(Sunroad Asset), the general partner of Marina Holdings.[4]
Contemporaneous with the liquidation of Sunroad Real Estate,
HCMP's partnership agreement was amended to reflect the
aforementioned assignment and sales and to reflect the fact that
(1) Marina Holdings as part of the sales assumed all HCMP

---

[3] The parties refer to Marina Holdings as Marina Holding.
We use the former name because that is the name in which Marina
Holdings filed its 1998 partnership return.

[4] The address of the principal place of business of Sunroad
Asset was the same San Diego address as that of HCMP, Sunroad
corporation, Marina Holdings, and a California general
partnership named Sunroad Marina Partners (Sunroad general
partnership).

obligations of Hope and Hope Jr., and accepted the partnership agreement, and (2) Sunroad Asset as part of the assignment assumed all HCMP obligations of Sunroad Real Estate and accepted the partnership agreement. As of the end of December 31, 1997, HCMP's partners were Sunroad Asset, Marina Holdings, and Collins, and their ownership interests were 70, 20, and 10 percent, respectively. Sunroad Asset was at that time HCMP's managing general partner.

On May 26, 1998, Sunroad Asset, in its capacity as HCMP's managing general partner, notified Collins that it had decided to dissolve HCMP pursuant to paragraph 11 of the partnership agreement. Paragraph 11 stated in relevant part that HCMP "shall be dissolved upon the * * * decision of the MGP [managing general partner] * * * [or] * * * The sale of all or substantially all of the Partnership assets and collection of all monies due therefrom". The notification also stated that paragraph 12 of the partnership agreement directed Sunroad Asset, as HCMP's managing general partner, to wind up and liquidate HCMP by selling its property and by applying and distributing those proceeds in the manner described in the partnership agreement. Paragraph 12, entitled "LIQUIDATION", stated in relevant part:

> 12.1. In the event of a dissolution as hereinabove provided, the Partnership shall forthwith be dissolved and terminated, and any certificates or notices thereof required by law shall be filed or published by the Liquidator (as defined below). The MGP * * * shall wind up and liquidate the Partnership

by selling the Partnership property.  The proceeds of liquidation and any other assets of the Partnership shall be applied and distributed in the following order of priority:

    12.1.1.  To the extent of debts and liabilities of the Partnership * * * and the expense of liquidation;

    12.1.2.  To the setting up of any reserves that the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership * * *;

    12.1.3.  To the payment of any loans or advances (including interest thereon) that may have been made by any of the Partners;

    12.1.4.  To the Partners in accordance with their respective capital accounts; and

    12.1.5.  Any balance then remaining shall be distributed to the Partners in proportion to their respective interest in the Partnership.

Sunroad Asset later informed Collins that it intended to distribute to him in connection with HCMP's dissolution the cash value of his HCMP interest as ascertained using the marina's July 31, 1998, appraised value of $16.5 million.  That approach was consistent with the partnership agreement's "buyout provisions", discussed infra, but inconsistent with the applicable provisions of paragraph 12 of the partnership agreement.  Collins also knew at or about that time that Sunroad Asset intended to distribute the marina to itself or to its affiliate.  That approach also was inconsistent with the applicable provisions of paragraph 12 of the partnership agreement.

On October 7, 1998, Collins commenced the lawsuit in the Superior Court of California, San Diego County (trial court), under the caption "Collins v. Feldman, et al., Case No. 724762".[5] Collins initially advanced in the lawsuit five causes of action. The first cause of action alleged that the Sunroad defendants had to provide Collins with an accounting. The second cause of action alleged that the Sunroad defendants breached a fiduciary duty owed to Collins. The third cause of action alleged that Collins was entitled to a recision of a resolution passed by the Port District approving an assignment of the marina lease from HCMP to Sunroad limited partnership. The fourth cause of action alleged that Collins was entitled to declaratory relief in the form of a declaration that HCMP's managing general partner must under the partnership agreement sell the marina in the public market to the highest bidder and may not under the partnership agreement distribute the marina to itself or to an entity under its control. The fifth cause of action alleged that Collins was entitled to a cancellation of the assignment of HCMP's partnership interest in the marina.

---

[5] "Feldman" is Aaron Feldman (Feldman), the president of Sunroad corporation, Sunroad Real Estate, and Sunroad Asset. The other defendants in the lawsuit were Sunroad Asset, formerly known as Sunroad corporation, Marina Holdings, the Port District, and a California limited partnership named Sunroad Marina Partners, L.P. (Sunroad limited partnership). (We refer to all five defendants collectively as the defendants. We refer collectively to the defendants other than the Port District as the Sunroad Defendants.)

Collins alleged in the lawsuit that the "buyout provisions" of the partnership agreement, which allowed for a liquidation of a partner's interest on the basis of the appraised values of HCMP's assets, were not applicable but that the applicable provisions were those in paragraph 12 of the partnership agreement. Collins also alleged that Sunroad Asset was not allowed by the partnership agreement to distribute the marina to itself or to an entity under its control but had to sell the marina in the public market and divide the net proceeds among the partners in accordance with their applicable percentages as set forth in the partnership agreement.

On November 18, 1998, Sunroad Asset, in its capacity as a general partner of HCMP and Sunroad limited partnership, formally assigned the rights, title, and interest in the marina lease from HCMP to Sunroad limited partnership. The document underlying this assignment was not executed by either Collins or the Port District. Approximately 3 weeks later, on December 8, 1998, Sunroad Asset sent to Collins a check for $389,662; i.e., the amount that Sunroad Asset maintained was the value of Collins's interest in HCMP as ascertained using the aforementioned appraised value of the marina. Collins did not cash this check upon receipt but deposited it with the trial court pending resolution of the lawsuit.

On April 15, 1999, HCMP filed its 1998 partnership return for the period from January 1 to December 7, 1998.  In addition to reporting that it was a "final" return, the return reported that as of the end of December 7, 1998, (1) HCMP had terminated and had no assets or liabilities, (2) HCMP had liquidated Collins's interest in it through a cash distribution of $389,662, (3) each HCMP partner's share of partnership liabilities was zero, and (4) each HCMP partner's capital account had a zero balance.  HCMP's partners as of December 7, 1998, were Collins, Marina Holdings, and Sunroad general partnership.[6]  HCMP reported on its 1998 partnership return that these partners had received the following distributions during 1998:

| | Money | Other than Money | Total |
|---|---|---|---|
| Sunroad general partnership | $63,996 | ($4,312,809) | ($4,248,813) |
| Marina Holdings | 18,415 | 466,023 | 484,438 |
| Collins | 389,662 | | 389,662 |

Marina Holdings and Sunroad general partnership each filed a "final" 1998 partnership return for the period from January 1, to December 7, 1998.  Marina Holdings reported on its 1998 partnership return that as of December 7, 1998, its general partner was Sunroad Asset, and its limited partners were Sunroad

_____

[6] Sunroad general partnership began business on Oct. 1, 1998.  The record does not reflect the details on the transfer of the HCMP interest from Sunroad Asset to Sunroad general partnership.

Asset and Walter Turner IRA.  The return reported that these partners had received the following distributions during 1998:

|  | Money | Other than Money | Total |
|---|---|---|---|
| Sunroad Asset |  |  |  |
| as a general partner | $14,906 | $348,451 | $363,357 |
| as a limited partner | 3,077 | 71,923 | 75,000 |
| Walter Turner IRA | 1,231 | 28,769 | 30,000 |

Sunroad general partnership reported on its 1998 partnership return that as of December 7, 1998, its partners were Sunroad Asset and Walter and Marian Turner Family Trust.  The return reported that these partners had received the following distributions during 1998:

|  | Money | Other than Money | Total |
|---|---|---|---|
| Sunroad Asset | $62,799 | ($4,886,102) | ($4,823,303) |
| Walter Turner IRA | 417 | (32,417) | (32,000) |

In or about July 1999, Sunroad limited partnership and MONY executed an Allonge to the $13.5 million promissory note.  The Allonge provided that Sunroad limited partnership had assumed HCMP's obligations under the MONY Loan.  The Allonge also provided that Sunroad Asset and Marina Holdings were not released from any obligation under the $13.5 million promissory note by virtue of their status as general partners of HCMP before its dissolution and that such was so notwithstanding HCMP's dissolution and the present assumption.  Sunroad limited partnership reported on its 1998 partnership return that its general partner was Sunroad Asset and that its limited partners

were Sunroad Asset, Walter and Marian Turner Family Trust, and Walter Turner IRA.  That return reported that it covered the taxable year of Sunroad limited partnership starting with its commencement of business on November 17, 1998, and ended on September 30, 1999, the last day of its fiscal year.  That return reported the income and expense of the marina as the income and expense of Sunroad limited partnership.

Collins and his wife filed their 1998 individual income tax return jointly.  They included with that return a Form 8082 with respect to four items reported on HCMP's 1998 partnership return. Collins reported on the Form 8082 that he was reporting these items inconsistently with HCMP's treatment of them.  First, HCMP reported on its 1998 partnership return and on Collins's 1998 Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., that the partnership return was a "Final return" and that the Schedule K-1 was a "Final K-1".  Collins reported on the Form 8082 that his 1998 Schedule K-1 was not final in that his HCMP interest was "involuntarily terminated" and he remained a partner until the final outcome of the lawsuit.  Second, HCMP reported on its 1998 partnership return that it had no debt as of the end of the reported period, and it reported on Collins's accompanying 1998 Schedule K-1 that Collins's share of HCMP's qualified nonrecourse financing at that time was zero.  Collins reported on the Form 8082 that his share of HCMP's qualified nonrecourse

financing was $1,350,000 as of December 31, 1998.  Third, HCMP reported on Collins's 1998 Schedule K-1 as to an analysis of his capital account that his share of net income per books, other increases, and other decreases totaled $1,017,332.  Collins reported on the Form 8082 that these items totaled $3,449 because "THE AMOUNT REPORTED ON THE K-1 IS DUE TO AN INVOLUNTARY TERMINATION OF THE PARTNER'S INTEREST.  THE TAXPAYERS WILL NOT BE REPORTING ANY GAIN AMOUNT, IF APPLICABLE, UNTIL THE FINAL OUTCOME OF THIS CASE."  Fourth, HCMP reported on Collins's 1998 Schedule K-1 that his withdrawals and distributions for that year totaled $389,662, or more specifically, the amount listed on that return as a cash distribution made to him during that year.  Collins reported on the Form 8082 that he had not received any distribution or withdrawal during 1998 in that the "CHECK RECEIVED BY TAXPAYER WAS TRANSFERRED TO THE CLERK OF THE SUPERIOR COURT OF SAN DIEGO PENDING FINAL SETTLEMENT OF THE CASE".

Collins's fourth cause of action in the lawsuit sought declaratory relief.  Collins moved the trial court for summary judgment as to this issue, as did the Sunroad defendants.  The trial court on August 11, 1999, issued an order granting Collins's motion and denying the motion of the Sunroad defendants.  Previously, the trial court had ruled that Sunroad Asset had dissolved HCMP as of May 26, 1998, and that Sunroad Asset's distribution of HCMP's assets was improper in that the

applicable provisions of the partnership agreement required a public sale of those assets.  The trial court's August 11, 1999, order stated that Sunroad Asset must sell the marina "on the open market at the highest price * * * [it] can procure after a reasonable marketing effort" and that it is "not legally entitled to distribute Sunroad Marina [the marina] * * * in kind to itself and/or an entity or entities it controls while distributing cash to Collins".

Following this order, Sunroad Asset declined to put the marina on the market.  On October 7, 1999, Collins amended his complaint in the lawsuit to add a sixth cause of action for specific performance.  This cause of action prayed that the trial court compel Sunroad Asset to sell the marina in the open market and to distribute the sale proceeds pro rata to the partners in compliance with paragraph 12 of the partnership agreement and the trial court's August 11, 1999, order.

The lawsuit was tried on April 4, 5, 6, and 26, 2000, and the trial court filed its Statement of Decision and entered its related judgment on October 17, 2000.  The judgment stated in relevant part that:

> IT IS ORDERED, ADJUDGED AND DECREED THAT:
>
> 1.  Pursuant to the Court's August 11, 1999, Order on Plaintiff's Fourth Cause of Action for Declaratory Relief, plaintiff is entitled to and has a judicial declaration that Harbor Cove Marina Partners dissolved as of May 26, 1998, and that the applicable Partnership

Agreement required a public sale of the partnership assets upon dissolution;

2. Notwithstanding the foregoing, plaintiff shall have and recover nothing against defendants, or any of them, except the plaintiff may withdraw the sum of $389,662 deposited with the Court, plus interest accrued thereon;

3. Defendants [sic] Sunroad Asset Management, Inc. shall have and receive from plaintiff the sum of $388,514.93 * * *; said sum represents the reasonable attorneys' fees and costs of Sunroad Marina, Inc. and its predecessors [sic] Sunroad Asset Management, Inc. in defending against plaintiff's First, Second, Fifth and Sixth Causes of Action, and which sum is net of plaintiff's reasonable attorneys' fees and costs with respect to the Fourth Cause of Action to August 11, 1999;

The judgment reflected the trial court's holding against Collins as to each of his six causes of action but for the fourth.

The trial court's accompanying "STATEMENT OF DECISION", which was amended on November 9, 2000, to correct a minor typographical error, reflected the trial court's finding that HCMP was dissolved on May 26, 1998, and that HCMP was terminated, was wound up, and had its assets distributed as of December 8, 1998. The trial court also found that the payment of $389,662 to Collins for his interest in HCMP was not less than the fair market value of that interest and ordered that Collins could withdraw from the trial court the $389,662 (with interest thereon) as full compensation for his interest in HCMP. Collins shortly thereafter withdrew the $389,662 from the trial court.

Collins appealed to the court of appeal the portion of the trial court's judgment that denied him specific performance of the provision in the partnership agreement that required the liquidation and sale of HCMP's assets upon its dissolution. The Sunroad defendants cross-appealed from the portion of the trial court's order granting Collins summary adjudication on the fourth cause of action that decreed that Sunroad Asset must sell HCMP's assets "on the open market" and may not distribute them in kind.

On March 25, 2002, respondent mailed the FPAA to "Tax Matters Partner, Harbor Cove Marina Partners" and mailed a copy of the FPAA to Sunroad Asset in its capacity as HCMP's tax matters partner. Respondent determined in the FPAA that HCMP's partnership return was correct as filed. The FPAA states that the bases for this determination were twofold. First, the FPAA states, HCMP filed a "final" partnership return for that year. Second, the FPAA states, the trial court concluded in its October 17, 2000, decision that HCMP "dissolved" as of May 26, 1998.

On March 29, 2002, 3 days after the FPAA was issued, the court of appeal affirmed the holding for Collins on the fourth cause of action and reversed the trial court's holding against Collins on the sixth cause of action concerning specific performance. The court of appeal directed the trial court to grant to Collins specific performance of that provision of the partnership agreement and awarded to him his costs of appeal.

The court of appeal noted that the trial court's denial of Collins's request for specific performance allowed Sunroad Asset to do expressly what the partnership agreement and the trial court had stated that it could not do; i.e., operate under the buyout provisions of the partnership agreement rather than the applicable liquidation provisions.

On April 26, 2002, respondent mailed another copy of the FPAA to Collins in his capacity as a notice partner of HCMP. When the tax matters partner of HCMP did not timely petition this Court to readjust partnership items, see sec. 6226(a), Collins, as an HCMP notice partner, filed his petition with the Court on August 15, 2002. Collins's petition to this Court is timely under section 6226(b)(1).

On January 15, 2003, upon remand of the lawsuit from the court of appeal, the trial court entered a minute order that directed specific performance of the partnership agreement as requested by Collins. The minute order also noted that HCMP had not been wound up as initially determined by the trial court and that Collins, as a partner in HCMP, was entitled to his share of leasehold profits from November 18, 1998, through the date on which the marina was sold in the open market. The minute order directed the Sunroad defendants to "account for and restore to Plaintiff his share of the profits as defined by the HCMP partnership agreement generated from and after November 18, 1998,

by operation of the Sunroad Marina leasehold, held by any of the Sunroad Marina Defendants through and including the present and continuing through the sale of the subject leasehold."

On February 14, 2003, the trial court entered a second amended judgment in the lawsuit. The second amended judgment stated in relevant part:

> IT IS ORDERED, ADJUDGED AND DECREED THAT:
>
> 1. Pursuant to the court's August 11, 1999, Order on Plaintiff's Fourth Cause of Action for Declaratory Relief, plaintiff is entitled to and has a judicial declaration that HCMP dissolved as of May 26, 1998, and that the applicable provisions of the HCMP partnership agreement required a public sale of the partnership assets upon dissolution;
>
> 2. Pursuant to the aforementioned Court of Appeal decision, plaintiff is granted specific performance as prayed in his Sixth Cause of Action. SMP [Sunroad limited partnership], as constructive trustee of HCMP, shall (i) sell HCMP's assets including, without limitation, the lessee's rights to the property commonly known as Sunroad Resort Marina, on the open market at the highest price SMP can procure after a reasonable marketing effort and (ii) divide the net sales proceeds among the parties as follows:
>
> Plaintiff Robert A. Collins...............12%
>
> Defendant Marina Holding [sic] Partners...24%
>
> Defendant Sunroad Asset Management, Inc. fka Sunroad Marina, Inc...................64%
>
> 3. Plaintiff is the sole prevailing party. He shall have and recover from the Sunroad Defendants reasonable trial attorney's fees in the sum of $168,829.50 and trial costs of suit in the sum of $4,841.70, for a total of $173,671.20.

4.    Plaintiff shall have and recover from the Sunroad Defendants costs and reasonable attorney's fees on appeal in the sum of $27,321.31.

5.    Except to the extent inconsistent with the Court of Appeal's reversal of judgment in favor of the Sunroad Defendants on plaintiff's Sixth Cause of Action * * *, plaintiff shall take nothing by his First, Second and Fifth Causes of Action.  The previous award of trial attorney's fees and costs to defendant Sunroad Asset Management, Inc. is vacated.

6.    Plaintiff shall take nothing by his Third Cause of Action against defendant San Diego Unified Port District ("the Port").  The Port shall have and receive from plaintiff its costs as shown on an approved memorandum of costs, the amount of which shall hereafter be entered in this blank: $_____.

7.    Pursuant to this court's Minute Order dated August 4, 2000, plaintiff's Notice of Pendency of Action dated and recorded January 13, 1999, in the office of the San Diego County Recorder as Instrument No. 1999-020302, has been and is expunged.

8.    Plaintiff's rights as a general partner of HCMP remain intact.  Accordingly, SMP shall forthwith provide to plaintiff an accounting of all its income and expenses on account of operation and refinancing of the Sunroad Resort Marina Leasehold from and after November 18, 1998, to date; and shall restore to plaintiff (a) 12% of net sums realized by any of the Sunroad Defendants from any and all loans repayment of which was secured in whole or in part by a lien upon the Sunroad Marina Leasehold, (b) 10% of all net operating income or other cash distributions made to any of the Sunroad Defendants on account of operations of the Sunroad Marina Leasehold from and after November 18, 1998, until sale of the Leasehold directed in Paragraph 2, above, and (c) 10% of all cash, cash equivalents or assets purchased from cash generated by operation of the Sunroad Marina Leasehold from and after November 18, 1998, held by any of the Sunroad Defendants.

9.    The Court retains jurisdiction to monitor compliance by the Sunroad Defendants with Paragraph 2 of this Second Amended Judgment.

10. This Second Amended Judgment supersedes and replaces the Amended Judgment entered herein on August 14, 2002.

Approximately 2 months later, on April 18, 2003, the trial court filed a document confirming a sale of the marina at auction to Sunroad limited partnership at the highest bid of $25.5 million. Bidders at the auction numbered three, and Sunroad limited partnership's high bid was the 14th bid after Sunroad limited partnership had made an opening bid of $16.5 million.

Following this sale, Sunroad limited partnership declined to transfer part of the sale proceeds to Collins as directed by the court of appeal decree granting specific performance and the trial court's order of February 14, 2003. Collins moved the trial court to compel compliance with the specific performance decree. On August 29, 2003, by way of a 2-page order, the trial court denied that motion. The order noted that Collins had withdrawn the $389,662 from the trial court and that it had stated in its initial decision, as amended, that this amount equaled the amount that Collins would have received had it granted his request for specific performance. The order concluded that California law (specifically, Preluzsky v. Pac. Co-operative Cafeteria Co., 232 P. 970 (Cal. 1925), which held that a voluntary acceptance of the benefit of a judgment or order is a bar to the prosecution of an appeal therefrom), estopped Collins from prosecuting his appeal of the portion of the

judgment that was ultimately reversed by the court of appeal in that, the trial court concluded, the court of appeal could not overturn that portion of the judgment without affecting Collins's right to the $389,662. By virtue of this estoppel, the order stated, the court of appeal decision and all orders post appeal were without any legal basis, and the judgment entered by the trial court on October 17, 2000, was the final judgment in the lawsuit. Collins filed a notice of appeal as to this order on September 8, 2003. That appeal is currently before the court of appeal pending its decision.

<u>Discussion</u>

This case is a TEFRA partnership proceeding that was brought by a notice partner. Respondent issued an FPAA to the notice partner, Collins, that determined no changes to HCMP's 1998 partnership return. Collins timely petitioned this Court to readjust HCMP's partnership items relating to the FPAA. Given the issuance of the FPAA, which we find to be valid, and Collins's timely petition for readjustment of HCMP's partnership items related thereto, we conclude that we have jurisdiction to redetermine all partnership items of HCMP for 1998 and to allocate properly those items among HCMP's partners. Sec. 6226(f); <u>Seneca, Ltd. v. Commissioner</u>, 92 T.C. 363, 365 (1989), affd. without published opinion 899 F.2d 1225 (9th Cir. 1990); <u>Transpac Drilling Venture 1982-22 v. Commissioner</u>, 87 T.C. 874

(1986). This is so even though the FPAA contained no changes made by respondent. See Univ. Heights at Hamilton Corp. v. Commissioner, 97 T.C. 278, 282 (1991).

Congress promulgated the TEFRA partnership unified audit and litigation provisions of sections 6221 through 6234 intending to simplify and streamline the audit, litigation, and assessment procedures with respect to partnerships and their partners. These provisions centralized the tax treatment of partnership items and resulted in equal treatment for partners through the uniform adjustment of each partner's tax liability in a single, unified proceeding. Chimblo v. Commissioner, 177 F.3d 119, 120-121 (2d Cir. 1999), affg. T.C. Memo. 1997-535; Kaplan v. United States, 133 F.3d 469, 471 (7th Cir. 1998). Because the income of a partnership is not subject to Federal income tax at the partnership level, but is passed through and taxed to the partners, multiple proceedings were required before TEFRA to address the tax treatment of partnership items. Chimblo v. Commissioner, supra at 121. Congress in enacting TEFRA intended that "the tax treatment of items of partnership income, loss, deductions, and credits will be determined at the partnership level in a unified partnership proceeding rather than separate proceedings with the partners." H. Conf. Rept. 97-760, at 600 (1982), 1982-2 C.B. 600, 662.

TEFRA requires that respondent notify partners of the beginning and end of partnership-level administrative proceedings. Sec. 6223(a). If and when an FPAA is issued as to those proceedings, the "tax matters partner", generally a person or entity designated as such by the partnership under applicable regulations or, more commonly, the general partner in control of the partnership, sec. 6231(a)(7); Chimblo v. Commissioner, supra at 121, may contest the FPAA within 90 days of its issuance by filing a petition for readjustment of "partnership items" in this Court, the Court of Federal Claims, or the appropriate Federal District Court. Sec. 6226(a). If the tax matters partner does not file such a petition by the close of that 90-day period, then any notice partner or 5-percent group may file a petition within the next 60 days. Sec. 6226(b)(1). Once an action for readjustment of partnership items is commenced by either the tax matters partner or a notice partner, any partner with an interest in the outcome of that action may participate in it. Sec. 6226(c) and (d).

In the context of TEFRA, a "partnership item" is any item that must be taken into account for the partnership's taxable year to the extent that regulations prescribe it as an item that is more appropriately determined at the partnership level. Sec. 6231(a)(3); Maxwell v. Commissioner, 87 T.C. 783, 789 (1986). Section 301.6231(a)(3)-1, Proced. & Admin. Regs., sets forth a

list of items which the Treasury Department has concluded are partnership items. That list includes the "partnership aggregate and each partner's share of * * * (i) Items of income, gain, loss, deduction, or credit of the partnership; * * * [and] (v) Partnership liabilities (including determinations with respect to the amount of the liabilities * * * and changes from the preceding taxable year)". Sec. 301.6231(a)(3)-1(a)(1), Proced. & Admin. Regs. That list also includes items relating to distributions from the partnership to the extent that a determination of those items can be made from conclusions that the partnership is required to make with respect to an amount, the character of an amount, or the percentage interest of a partner in the partnership, for purposes of the partnership books and records or for purposes of furnishing information to a partner. Sec. 301.6231(a)(3)-1(a)(4), Proced. & Admin. Regs. The regulations state further that a partnership item not only includes those items expressly listed in the regulations, but also includes "the legal and factual determinations [e.g., the partnership's taxable year] that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc." Sec. 301.6231(a)(3)-1(b), Proced. & Admin. Regs.

Collins disputes in the Form 8082 the four items discussed supra pp. 14-15. Each of these items is an HCMP partnership item

in that it relates to information underlying the determination of each HCMP partner's share of liabilities and distributions.

The linchpin of the four items is the parties' dispute as to whether HCMP terminated in 1998 for Federal tax purposes. Section 708(a) provides that a partnership continues to exist until terminated. Section 708(b) provides that a termination requires the happening of one of two events. First, under section 708(b)(1)(A), a partnership terminates when "no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership". Second, under section 708(b)(1)(B), a partnership terminates when "within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits."

The parties focus on the first of these events. So do we.[7] While the dissolution of a partnership is governed by State law, the termination of a partnership for Federal tax purposes is controlled by Federal law. A termination of a partnership for Federal tax purposes may be different from its termination,

_____

[7] As to the second event, the liquidation of a partnership interest, as reportedly occurred here, is not a "sale or exchange" for purposes of sec. 708(b)(1)(B). Sec. 1.708-1(b)(2), Income Tax Regs. (Sec. 1.708-1, Income Tax Regs., was amended on Jan. 3, 2001. T.D. 8925, 2001-1 C.B. 496, 505. That amendment, in relevant part, removed old par. (b)(2) and redesignated old par. (b)(1). Id., 2001-1 C.B. at 500. This part of the amendment applies to this case in that it is effective Jan. 4, 2001. Id., 2001-1 C.B. at 496.)

dissolution, or winding-up under State law, and a partnership may continue to exist for Federal tax purposes even though State law provides that the partnership has terminated, dissolved, or wound-up.  Fuchs v. Commissioner, 80 T.C. 506, 509-510 (1983); Neubecker v. Commissioner, 65 T.C. 577, 581-582 (1975); see also Maxcy v. Commissioner, 59 T.C. 716 (1973).  When a partnership terminates under Federal law, its taxable year closes on the same date.  Sec. 1.708-1(b)(3), Income Tax Regs.

For purposes of Federal tax law or, more specifically, section 708(b)(1)(A), the date of termination is the date on which the partnership winds up its affairs in cessation of its business operation.  Sec. 1.708-1(b)(3)(i), Income Tax Regs. Whether a partnership has done so is a factual determination that generally rests on an analysis of the various subsidiary elements of proof.  The regulations interpreting section 708(b)(1)(A) establish a liberal approach to a finding of a business nexus sufficient not to terminate a partnership.  In accordance with those regulations, a partnership continues to exist even when its operations are substantially changed or reduced in a period of winding up, and even when its sole asset during that period is cash.  Sec. 1.708-1(b)(1), (3)(i), Income Tax Regs.  A termination under section 708(b)(1)(A) occurs only when "the operations of the partnership are discontinued and no part of any business, financial operation, or venture of the partnership

continues to be carried on by any of its partners in a partnership." Sec. 1.708-1(b)(1)(3)(i), Income Tax Regs. In other words, the regulations indicate, a partnership is terminated under section 708(b)(1)(A) only when the winding up of its business affairs is completed and "all remaining assets, consisting only of cash, are distributed to the partners". Id.

The decided cases apply the statute similarly. Those cases indicate that a nominal amount of continuing business or financial activity precludes a partnership from terminating for Federal tax purposes even when the partnership has abandoned or discontinued its primary business activity. In Foxman v. Commissioner, 41 T.C. 535 (1964), affd. 352 F.2d 466 (3d Cir. 1965), for example, a partnership sold its assets to a corporation in which the partners were shareholders and received in exchange two promissory notes. The Court held that the partnership continued to exist after its asset sale in that it held the notes received in the sale, collected interest on those notes, and made minor purchases. Id. at 556-557. In Baker Commodities, Inc. v. Commissioner, 415 F.2d 519 (9th Cir. 1969), affg. 48 T.C. 374 (1967), the Court of Appeals for the Ninth Circuit reached a similar result. There, the partnership's principal asset was a convalescent hospital that was closed and then sold 9 months later in exchange for a note. The court cited Foxman and held that the partnership's sale of its asset did not

result in its termination.  Id. at 526.  Respondent argued in Baker Commodities, Inc. that the partnership had terminated upon its sale of the hospital because it then ceased engaging in its principal business activity.  The court disagreed.  The court held that the cessation of a partnership's primary purpose is not necessarily a termination under section 708 but what is required by the statute is a complete cessation of all partnership activity, inclusive of a distribution to the partners of all of the partnership's assets.  Id.; accord Neubecker v. Commissioner, supra at 582-583 (complete cessation of the partnership business is required to effect a termination of the partnership under section 708(b)(1)(A)).  The court noted that a partnership whose sole operation is the winding up of its affairs terminates only upon the cessation of all activity and the distribution of its remaining asset, cash.  Baker Commodities, Inc. v. Commissioner, supra at 526-527.

In Baker Commodities, Inc. v. Commissioner, supra at 526, the court also relied upon Ginsburg v. United States, 184 Ct. Cl. 444, 396 F.2d 983 (1968).  There, the partnership discontinued its primary business activity, the development of land, but continued to cultivate the land.  The Court of Claims declined to find that the partnership had terminated through a cessation of its primary business.  The Court of Claims rejected the

Government's argument that a partnership terminates upon the abandonment of its primary purpose, stating:

> Subparagraph (A) of Section 708(b)(1) provides that a partnership is terminated if 'no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership' (emphasis added). There is nothing to indicate that this provision requires less than what it says--a complete cessation of all partnership business--and therefore we cannot accept the Government's contention that a partnership is terminated if it abandons just its 'primary purpose.' See David A. Foxman, 41 T.C. 535, 557 (1964), aff'd, 352 F.2d 466 (C.A. 3, 1965) (no termination even though 'these items were of comparatively minor character in contrast to the enterprise previously carried on'); James v. United States, 63-1 U.S.T.C. 9478, at 88307, 88309 (M.D. Ga. 1963); cf. Treas. Reg. § 1.708-1(b)(1). [Id. at 988.]

The Court of Claims also stated that "the fact that the partnership continued to hold the property for a business purpose--investment--might well be an adequate showing that it was not sufficiently inoperative to evoke the termination provision of Section 708(b)(1)(A)." Id.; accord Yagoda v. Commissioner, 39 T.C. 170, 182-183 (1962) (partnership that ceased its business and existence in 1945 was not terminated for Federal income tax purposes until 1947, when it finished winding up its affairs), affd. 331 F.2d 485 (2d Cir. 1964); Hoagland v. Commissioner, T.C. Memo. 1971-310 (partnership did not terminate as a result of cessation of business where the land development business for which it was originally formed was frustrated and

the partnership's only function was holding land pending its sale).

Turning to the facts at hand, we are unaware of any decided case that directly answers the question at hand; to wit, whether a partnership terminates for Federal tax purposes when (1) its controlling partner purportedly winds up the affairs of the partnership's business operation by using procedures apparently contrary to those stated in the partnership agreement, (2) another partner has filed a lawsuit to compel the use of the procedures stated in the agreement, and (3) a resolution of that lawsuit could reasonably lead to the partnership's reporting in a subsequent year of significant income, credit, gain, loss, or deduction. With our understanding of the statute, regulations, and judicial jurisprudence in mind, however, it is evident to us that we must answer this question in the negative and hold that HCMP was not terminated during 1998. HCMP's affairs as to its business operations were not completed as of the end of that year in that an HCMP partner, Collins, was at that time legitimately challenging the procedures used by the managing general partner in winding up the partnership's business, and a resolution of Collins's lawsuit could reasonably lead to HCMP's reporting in a subsequent year of significant income, credit, gain, loss, or

deduction (e.g., from a public sale of the marina).[8] While HCMP's managing general partner may have subjectively intended to terminate HCMP for Federal tax purposes during 1998, the fact of the matter is that it failed to wind up HCMP's business operation in accordance with the procedures which the HCMP partners as a whole had agreed would be applied in such a situation. The agreed-upon procedures of paragraph 12 state clearly and unequivocally that the managing general partner of HCMP shall in the case of HCMP's dissolution wind up and liquidate the partnership by "selling the Partnership property".

For Federal tax purposes, Congress has given the partners of a partnership broad authority to negotiate the terms of their business relationship, including the terms governing their business's formation, operation, and dissolution, so as to achieve simplicity, flexibility, and equity as between the partners. See Foxman v. Commissioner, 41 T.C. at 549-552 (and the legislative history cited therein); see also Moore v. Commissioner, 70 T.C. 1024, 1033 (1978); Kresser v. Commissioner,

---

[8] We also do not believe that Collins's HCMP partnership interest was effectively liquidated as of the end of 1998 in that (1) he had filed the lawsuit challenging as inconsistent with the partnership agreement his right to keep the $389,662 check sent to him as a liquidation distribution and (2) he had delivered that check to the trial court pending resolution of the lawsuit. Cf. Bones v. Commissioner, 4 T.C. 415, 420 (1944) (taxpayer's refusal to cash a check did not result in constructive receipt of the income where cashing the check would impair the taxpayer's legal position by creating a situation that might be construed as an accord and satisfaction concerning a disputed claim).

54 T.C. 1621, 1630-1631 (1970). Given this broad grant of authority, the legislative intent for simplicity, flexibility, and equity as between the partners, and the fact that each partner's distributive share of income, gain, loss, deduction, or credit generally turns on the partnership agreement, sec. 704(a), it seems to us that the winding up of HCMP (and hence its termination) for Federal tax purposes must also be in accordance with the partnership agreement. In fact, but for a procedural violation that the trial court stated was committed by Collins as to the lawsuit, and which the trial court believed made void all judicial action taken in the lawsuit after October 17, 2000, even the trial court has concluded that HCMP continues to exist for State law purposes. The trial court concluded in 2003 that HCMP was not then wound up, that Collins remained an HCMP partner, and that Collins, as a partner, was entitled to his share of HCMP income from November 18, 1998, through the time that the marina was publicly sold. As the Treasury regulations on the termination of partnerships are careful to note, a partnership's termination under section 708(b)(1)(A) does not occur until the winding up of its business operations is completed.

Respondent seeks a contrary holding focusing on the fact that HCMP and its partners other than Collins filed tax returns reporting that HCMP had been terminated during 1998 and that Sunroad limited partnership filed a tax return for a period

thereafter reporting that it had acquired HCMP's business, assets, and liabilities. According to respondent, Collins may not unilaterally disavow his other partners' view that HCMP had terminated during 1998, nor the fact that HCMP's business operation is now being reported by another taxpayer. We find respondent's focus misplaced. Simply because a managing partner acts unilaterally to dissolve a partnership, to zero out the partnership assets and liabilities, and to report to the Commissioner that the partnership has been terminated does not mean that the partnership has terminated for Federal tax purposes. Nor is it critical to our decision that HCMP is no longer reporting the marina business as its own. What is important to us is that the parties to the HCMP partnership agreement had agreed that the marina would be sold by HCMP in the case of a dissolution, that basic tax principles establish that any income or loss on such a sale must be reported by HCMP, and that such a sale by or on behalf of HCMP may reasonably occur in a year after 1998.

We hold that HCMP was not terminated during 1998 as reported by its managing general partner and as determined by respondent. All arguments for a contrary holding have been considered, and those arguments not discussed herein have been found to be without merit.  Accordingly,

Decision will be entered under Rule 155.